**In re Stuart SILVERSTEIN and Sheila Silverstein, Debtors.**

**Bankruptcy No. 088–80342–21.**

United States Bankruptcy Court,
E.D. New York.

Dec. 12, 1988.

Macco, Hackeling & Stern by C. Steven Hackeling, Huntington, N.Y., for debtors.

Miller & Wrubel, P.C. by Martin D. Edel, New York City, for Prudential Bache Securities.

## OPINION

CECELIA H. GOETZ, Bankruptcy Judge:

Before the Court is a motion by Prudential Bache Securities Inc. ("Prudential") to convert this Chapter 11 proceeding to Chapter 7. Prudential initially moved in the alternative to convert or dismiss, but during the hearing withdrew the motion to dismiss. The United States Trustee supported Prudential's motion but considered dismissal the better alternative on the theory that this is a case involving one creditor, Prudential, and one asset, a house. The debtors would not oppose dismissal but are strongly opposed to conversion. Prudential has filed a claim for nearly $1.5 million to which the debtors have objected.

An evidentiary hearing was held on October 27, 1988 and November 7, 1988. For the reasons which follow the Court has concluded that Prudential is entitled to the relief it seeks and that conversion to Chapter 7 is in the best interest of the estate and creditors.

## THE FACTS

The debtors filed a voluntary petition under Chapter 11 on April 19, 1988. Their petition showed liabilities of $1,805,952 consisting of $43,000 in priority tax debt, $269,400 in secured debt and $1,493,552 in unsecured debt. They claimed assets of $430,800, principal of which is their home at 3 Pudding Lane, Dix Hills, New York, on which they placed a value of $250,000 and which is burdened by two mortgages totaling $214,000. Their other assets are a condominium in Florida, now in foreclosure, and promissory notes with a face value of $105,700. Apart from Prudential, as to which their schedules show a disputed debt of $1,457,000, their other unsecured creditors are owed $36,557.

According to the debtors' Chapter 11 Statement, they are engaged in the businesses of "accounting and vending machines." Both businesses are of recent origin. Although Stuart Silverstein worked as an accountant many years ago, until October 19, 1987 he was retired, living on his capital investments.

On that date, which has become known as "Black Monday," Mr. Silverstein, who maintained a margin account in the name of himself and his wife with Prudential, suffered a loss, according to Prudential's record, of approximately one and a half million dollars. He was heavily invested at that time in "puts" and "calls" and the sellout of his account, which took place that day and the following day, resulted in the described loss.

Mr. Silverstein began dabbling in "puts" and "calls" over four years ago. Thereafter he stepped up the level of his trading in this type of security to the point where, apart from $400,000 in Treasury Bonds, naked "puts" and "calls" appear to have represented all, or nearly all, of his investments.

Mr. Silverstein did all the trading for his wife whose only employment in recent years was the running of an unsuccessful nail salon for a brief period in the '70's. His account with Prudential, maintained in the name of himself and his wife, also included what was left of his father's account which the debtor merged with his own account some years ago. His father, Samuel Silverstein, is very advanced in years and Stuart Silverstein has for many years held a power of attorney with respect to his father.

Stuart Silverstein had early warning of what was awaiting him on that fatal Mon-

day. The preceding Friday he received a call from Prudential's Miami office where he maintained his account, telling him that $100,000 was needed to cover margin requirements. He assured the Prudential executive to whom he spoke that the money would be deposited Monday and apparently arranged to bring a check over to Prudential's Melville, New York office. He was prepared to do so until he learned, early Monday morning, from his home computer, the results of the trading in the London market which foretold what was about to happen. In consequence, he did not bring any money to the Melville office nor did he go there. Indeed, he made no effort to communicate with Prudential, nor it with him, except that in due course he received the various formal notices advising him that he had been sold out with the results described above.

Within the next few weeks Mr. Silverstein consulted C. Steven Hackeling, Esq., a lawyer specializing in bankruptcy, but decided against taking immediate advantage of the bankruptcy laws. Instead, on the advice of counsel, he used up a $200,000 line of home equity credit he had negotiated earlier, of which to that point in time he had used only $100,000. He took the $100,000 still available, put it in his father's name in the Barnett Bank in Florida and subsequently transferred a portion of that to Manufacturers Hanover Bank in Commack where he maintained his own account, still keeping it in his father's name. That money has since been used for his and his father's living expenses and other expenditures. Although the checks are signed by his father they have all been drawn by Stuart Silverstein. These withdrawals have reduced the money in this account to a few thousand dollars.

In the debtors' petition, the transfer of $100,000 to Mr. Silverstein's father is explained as follows:

The debtor's position is that he was investing approximately $150,000.00 of father's money in the stock market which was wiped out together with $600,000.00 of his own money. As a result, the debtor took an equity loan mortgage on his house and restored the money he was holding in the trust for his father.

In November and December 1987, Stuart Silverstein, using some of the money in his father's bank account, purchased five cotton candy dispensing machines at a total cost of $18,000, of which four are still sitting in his garage; at approximately the same time he purchased ten condom vending machines at a total cost of $5,000, of which six are currently in use, generating a total monthly income of $70.00. In February or March 1988, Sheila Silverstein purchased a license for $495 from a business which matches high school seniors with scholarships from which her gross income to date has been $89.00.

Following the market loss, Mr. Silverstein, from resources that have not been disclosed, lent approximately $44,000 to Larry and Carla Wiener, living in Dix Hills and described solely as close friends ("the Wiener loan"). He believes, but is not sure, that he is receiving six percent interest on these funds. He has received small repayments of principal during the past year. His only other asset is a note he received some years ago from the House of Ronnie. It is for $61,000, but payments on the principal have ceased.

Within a few months of the debtors' debacle Prudential sued Mr. Silverstein for the loss it had sustained on his account. That action was stayed when this bankruptcy proceeding was filed. Prudential's claim is for the same loss as its suit in the state court. The debtors have objected to that claim on the following grounds:

[A]ny loss that PRUDENTIAL BACHE SECURITIES suffered over and above the approximate $740,000.00 which the Debtors maintained in their brokerage account was caused by PRUDENTIAL BACHE'S own negligence or intentional decision to sellout the Debtors' stock position in a manner which was least advantageous to the Debtors and most advantageous to PRUDENTIAL BACHE. As such, the claimant failed to comply with Article 9 of the New York State Uniform Commercial Code and the Common Law and other statutory provisions

which require a good-faith sale of collateral.

What caused the debtors to file their Chapter 11 Petition on April 19, 1988 was not the Prudential lawsuit but the threat of a tax lien being filed against their Dix Hills property based on unpaid 1979 taxes.

Since filing for relief under Chapter 11, Mr. Silverstein has resumed the practice of accounting as an independent entrepreneur and has qualified himself as a certified public accountant.

The debtors' monthly expenses, including mortgage payments of nearly $3,000, have averaged over $6,000. Each month the debtors have been in Chapter 11, their expenditures have exceeded their income. They have made up the difference by "loans" from Mr. Silverstein's father. Since filing, just over six months ago, they have spent approximately $10,000 more than they have made.

Nevertheless, at the time of the hearing on Prudential's motion, Mr. Silverstein anticipated that the debtors' income would exceed their disbursements in the period from November 1988 through January 1989. He expected to gross from his accounting practice over $5,000 in November and December 1988 and nearly $8,000 in January 1989. He hopes to make as much as $60,000 to $100,000 from his accounting practice in 1989.

In addition to Mr. Silverstein's accounting practice, the debtors project income of $500 to $1000 a month from sales by Mrs. Silverstein of a water treatment device. In October she sold six such devices to friends and relatives on which her gross profit was $75 per unit (or $450 in all) from which she has yet to pay sales taxes, delivery charges or insurance. Now that she has supplied the customers most readily available to her, her two sons and her friends, any substantial future income from this source is highly questionable.

The debtors' living expenses for mortgage payments, utilities, automobiles, insurance, food, home maintenance and repairs are between $4,000 and $5,000 a month, before any allowance for clothing, medical, dental, drug expenses and taxes.

Their business expenses are in the neighborhood of $1,000 a month. Assuming expenses of $6,000 a month, they project a positive cash flow for the period from November 1988 through January 1989 of over $5,000. The projection, however, includes gross sales of between $500 and $1,000 a month of Mrs. Silverstein's water treatment devices without any allowance for income taxes. If these items, plus the personal expenditures for clothing, home maintenance, entertainment and medical expenses were included, the result would probably be a negative, not a positive, figure.

The Dix Hills residence in which the debtors are living has a liquidation value of at least $481,500. It is an impressive looking cedar shake and brick structure with an inground gunite swimming pool. It has five bedrooms and three and a half baths, including one attached to the master bedroom that has recently been improved and includes a jacuzzi. Both the living room and dining room have fireplaces. Prudential's appraiser, who had not had the opportunity to view the interior with the improvements in it, appraised the house as having a value of $535,000; the debtors' appraiser, who had seen the interior and who had observed some seepage of water in the unfinished basement, placed a market value on the house of approximately $350,000–360,000.

The value of the houses in Dix Hills is not currently appreciating; the real estate market there is stagnant.

If this proceeding were converted to Chapter 7, there would be available to creditors approximately $230,000 from the sale of the house, based on its liquidation value. This is the figure arrived at by deducting the two mortgages, the $20,000 homestead exemption and selling expenses from liquidation value. Creditors would also receive whatever could be realized from the vending machines and the notes.

The debtors have filed a Chapter 11 plan which leaves everything in suspense paying out nothing to creditors until Prudential's $1.5 million claim is resolved. If it is re-

solved favorably to the debtors they propose to pay their creditors, which will then exclude Prudential, 100%. If it is resolved adversely to them, they propose to turn over to their creditors, which will then include Prudential, whatever remains of the Wiener loan of $44,000, the defunct note from the House of Ronnie and $10,000. The $10,000 figure represents what they see as the excess in the equity in their home over the existing encumbrances plus their $20,000 homestead exemption. They assume their home to be worth only $250,000.

Each month the Chapter 11 proceeding has been pending the estate has been diminished. Even if Mr. Silverstein realizes the $100,000 a year gross income which he optimistically projects, that situation is unlikely to change, in view of the personal income taxes that will then become due.

Mr. and Mrs. Silverstein have lately consulted lawyers specializing in securities law and are contemplating suing Prudential, or counterclaiming in the pending state court proceeding, on the theory that Prudential owed them a duty to warn them of the dangers of investing in naked "puts" and "calls" and to advise them that this was not a suitable investment for them. Their petition claims no such cause of action as an asset, nor has it been asserted in their objection to Prudential's claim.

## DISCUSSION

Section 1112(b)(1) of the Bankruptcy Code authorizes for cause the dismissal or conversion of a Chapter 11 case, whichever is in the best interest of creditors and the estate. Cause includes nine statutorily defined factors, among them is "continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(1).

As the legislative history makes clear, the list of reason enumerated in § 1112 for converting or dismissing a Chapter 11 case is not intended to be exclusive. Whether "cause" exists for converting or dismissing a case must be determined by the facts of the particular case before the court.

The authoritative House Committee Report says with respect to the provisions regarding conversion or dismissal that they give "wide discretion to the court to make an appropriate disposition of the case when a party in interest requests." House Report No. 95–595, 95th Cong. 1st Sess., p. 405 (1977), 1978 U.S.Code Cong. & Admin. News, pp. 5787, 6361. The list in the statute is "not exhaustive. The court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases." *Id.* at 406, 1978 U.S.Code Cong. & Admin. News p. 6362.

Prudential has sought to bring itself within what the statute first lists as constituting cause—the continuing diminution of the estate and the absence of a reasonable likelihood of rehabilitation. There can be no question that the first element is present. Each month the debtors have been spending more than they make. They have been compensating for the difference between income and outgo by borrowing from Mr. Silverstein's father, without any authority from the Court, contrary to 11 U.S.C. § 364(b). Whether the debtors have thereby created an administrative debt with priority over their pre-petition obligation is an issue that need not now be resolved.

But the diminution of assets is not uncommon in the early stages of a Chapter 11 proceeding. A debtor which has been losing money may need time to turn its business around. Hence the statute requires not only continuing loss, but the absence of a likelihood of rehabilitation.

There is no difficulty in giving that requirement meaning where a business debtor is involved. Where an ongoing business seeks relief, what that phrase means is that such business will be re-established on a firm, sound basis, if allowed a "breathing space in which to return to a viable state." *In re Dolton Lodge Trust No. 35188*, 22 B.R. 918, 922 (Bankr.N.D.Ill.1982).

This is consistent with the objectives sought to be achieved through Chapter 11, as discussed in the authoritative House report:

The purpose of a business reorganization case, unlike a liquidation case, is to restructure a business's finances so that it may continue to operate, provide its employees with jobs, pay its creditors, and produce a return for its stockholders. The premise of a business reorganization is that assets that are used for production in the industry for which they are designed are more valuable than those same assets sold for scrap.... Cash flow problems may develop, and require creditors of the business, both trade creditors and long-term lenders, to wait for payment of their debts. If the business can extend or reduce its debts, it often can be returned to a viable state.

House Report No. 95–595, at 220, 1978 U.S.Code Cong. & Admin.News, p. 6179.

But what does "reasonable likelihood of rehabilitation" mean where a consumer debtor invokes Chapter 11? Indeed, there is respectable authority that persons not engaged in business are not even eligible for relief under Chapter 11. *Wamsganz v. Boatmen's Bank of De Soto,* 804 F.2d 503 (8th Cir.1986); *In re Little Creek Development Co.,* 779 F.2d 1068, 1073 (5th Cir. 1986); *In re Winshall Settlor's Trust,* 758 F.2d 1136, 1137 (6th Cir.1985). The Eighth Circuit, making an exhaustive analysis of the legislative history, concluded that "taken as a whole, [it] shows that Congress meant for Chapter 11 to be available to businesses and persons engaged in business, and not to consumer debtors." *Wamsganz, supra,* 804 F.2d at 505.

However other courts, including both this bankruptcy court and the bankruptcy court for the Southern District of New York, the Eleventh Circuit and the Bankruptcy Appellate Panel for the Ninth Circuit have reached a different conclusion. *In re Moog,* 774 F.2d 1073 (11th Cir.1985); *In re Warner,* 30 B.R. 528 (Bankr. 9th Cir.BAP 1983); *In re Greene,* 57 B.R. 272 (Bankr.S.D.N.Y.1986); *In re Stern,* 50 B.R. 285 (Bankr.E.D.N.Y.1985); *Grundy National Bank v. Shortt,* 80 B.R. 802 (W.D. Va.1987); *In re McStay,* 82 B.R. 763 (Bankr.E.D.Pa.1988). In *In re Rosner,* 48 B.R. 538 (Bankr.E.D.N.Y.1985), this Court entertained a consumer Chapter 11 which

was not questioned. Bankruptcy Judge Howard Schwartzberg, in concluding that individuals not operating any business are, nevertheless, eligible for relief under Chapter 11, also found support in the legislative history, in particular Senate Report 989, 95th Cong.2d Sess., 3 (1978), reprinted in 1978 U.S.Code Cong. & Admin.News, 5787, 5789. *In re Greene, supra* at 275.

Assuming therefore that a consumer debtor may take advantage of Chapter 11, what is meant by "absence of a reasonable likelihood of rehabilitation" when a consumer debtor is invoking Chapter 11, not to preserve the assets of a business, but to prevent the liquidation of his personal possessions, his residence, his car or his stamp and coin collection?

Unlike a business which ceases to be if it cannot operate at a profit, the "viability" of a consumer debtor fortunately does not depend on his finances. Nor in most cases, including this one, will the consumer debtor's income depend upon the continued use of the possessions he is withholding from his creditors. Mr. Silverstein's ability to pursue his accounting practice and his success in doing so is totally unrelated to what residence he occupies. For him to work as an accountant does not require him to live in a half million dollar mansion complete with swimming pool, nor to continue depleting his other assets. His projected income should cover his normal living expenses, even if inadequate to keep up his former style of life.

It is no doubt true that Mr. Silverstein's accounting practice is growing, but such growth is unrelated to the assets he is currently consuming. The lack of such relationship is shown by the fact that whatever happens, whatever improvement takes place in his accounting practice, his creditors will receive, under the debtors' Chapter 11 Plan, no more and no less than they would be paid today under Chapter 7. Their Chapter 11 Plan remains the same whatever their personal fortune; they propose to give their creditors exactly what liquidation would entitle them to. In the event of liquidation, their creditors, if they

did not include Prudential, will receive 100 percent of their claims because the debtors' present assets exceed the sum of all their debts, if Prudential is excluded; if these debts include Prudential, the debtors propose to turn over to their creditors only what they deem the equity in their house to be in excess of their homestead exemption, $10,000, plus the other assets they own. Therefore, the future of Mr. Silverstein's accounting practice will affect neither positively nor negatively what the creditors will ultimately receive under the debtors' plan of reorganization, nor give them anything different from a Chapter 7 liquidation today.

As the United States Trustee points out in supporting Prudential's motion, what the debtors are trying to do here is "hold off their other creditors while waiting for the resolution of their litigation with Prudential." That perhaps would be unobjectionable if the debtors were not in the meanwhile consuming the assets available for payment of Prudential's claim assuring that any victory by Prudential will turn out to be Pyrrhic.

The debtors' position that their assets should not be liquidated until their objection to Prudential's claim had been resolved might have more appeal if, pending that resolution, Prudential was not being prejudiced by the continued consumption by the debtors of their assets and if the debtors' plan provided that in the event it was determined that the Prudential claim was valid, Prudential would be able to participate in any improvement in the debtors' finances. However, this is not what the plan provides. The plan merely forces Prudential to wait until its claim is determined as valid, then take what it would have received earlier if there had been an immediate liquidation. During all this time the debtors are to live in their home, perhaps encumber it more, if and when it appears that liquidation is unavoidable.

Furthermore, the debtors' objection to Prudential's claim falls short of applying to the whole of that claim. Even if they prevailed on their objection to it they would still owe Prudential at the very least the $100,000 which Mr. Silverstein committed himself to deliver before the market collapsed. Whatever the merits of their objection to the manner in which their account was liquidated the following Monday or Tuesday, they would still owe Prudential the $100,000 Mr. Silverstein acknowledged owing on Friday.

It is true that an affirmative counterclaim might wipe out that debt, but while the debtors have suggested that they may have such a claim, it has not yet been asserted in any court. At the hearing on Prudential's motion the only right to affirmative relief then claimed by the debtors was Prudential's failure to warn the debtors of the dangers of speculating in "puts" and "calls" and of the unsuitability of such speculation to their financial circumstances. Without prejudging that claim, but evaluating it solely for purposes of the present motion it appears to be one that will be difficult to sustain in view of Mr. Silverstein's sophistication as an investor. He is not only trained as an accountant, but he was a subscriber to specialized publications dealing with "puts" and "calls", had his own software program and had been buying and selling "puts" and "calls" for four years before "Black Monday." Did he need to be told that he was engaged in the type of activity in which he was running the risk of substantial losses as well as substantial gains?

As for the debtors' suggestion that Mrs. Silverstein was not as well informed as her husband, he made all the decisions, not she, and it appears more likely than not that the money that was lost was his, not hers. If the debtors had any confidence in the claims they are now making they would not have waited until now to assert their existence.

 The Bankruptcy Code gives a debtor no right to use up his assets while litigating at leisure with his creditors. In a Chapter 11 case involving a consumer debtor, the phrase "absence of a reasonable likelihood of rehabilitation," has to be given a meaning consistent with the overall purposes of the Code. Guidance can be found in the parallel problem presented when a

secured creditor seeks relief from the automatic stay so as to be able to apply the secured property to the payment of the debt owed him. Section 362 authorizes such relief if the debtor does not have an equity in such property and "such property is not necessary to an effective reorganization." The test should be similar where unsecured creditors request conversion so as to be able to apply the debtor's property to the payment of the debt owed them before the debtor consumes it all. The question should be whether the continued consumption of such property is necessary to an effective reorganization or to put it in terms of § 1112(b), is it needed for the economic rehabilitation of the debtor. In this case, the answer is clearly in the negative and, therefore, Prudential is entitled to the relief it seeks.

In far less compelling circumstances where the debtors were seeking to use their residence to fund a plan, Bankruptcy Judge Schwartzberg granted relief similar to what Prudential is seeking here. *In re Greene, supra.*

The Court does not agree with the U.S. Trustee that dismissal, rather than conversion to Chapter 7, is in the interest of the creditors and the estate. There are substantial assets present here which will be consumed by the debtors if a trustee is not put in charge. Furthermore a trustee may be able to recover money for the estate from the debtor's father since the facts suggest that the payment to him was not only a preference but might even have been a fraudulent conveyance. A Chapter 7 trustee may be able to uncover other assets to which Prudential will be entitled should it establish its claim for the full sum for which it filed.

The longer this case is permitted to remain in Chapter 11 the less money there will be to pay creditors because in theory and in fact any improvement in Mr. Silverstein's income will be for the debtors' benefit while the accompanying diminution of their assets will be to the prejudice only of their creditors. Indeed, the figures in the record do not fully reflect the steady deterioration in the debtors' position because the figures do not reflect accrued expenses, including the taxes which are due on the income being earned.

The debtors urge that they should be permitted to remain in Chapter 11 and obtain the same relief as they would in Chapter 13 if they were not ineligible for that chapter because of the magnitude of the debt owed Prudential. The debtors' argument builds on a faulty premise. At the present time, they lack the income that would be required to fund a plan which would satisfy Chapter 13. Their position that the total equity in their house in excess of their homestead exemption is only $10,000 is wholly fallacious. Even their appraiser put the value of the house at a figure which would result in an equity in excess of their exemptions of around $100,-000. As the Court has earlier found, it believes the correct figure is closer to $250,000. In view of this equity the debtors would be unable to demonstrate the ability to make payments of the magnitude required. At the present time this Court could not find that the debtors would be able to make the necessary payments. 11 U.S.C. § 1325(a)(6). But even if the debtors could qualify under Chapter 13 that is not the test of their right to stay in Chapter 11 in which, far from making payments to a Chapter 13 Trustee and building up an estate for their creditors, they are consuming such assets as still remain in their hands.

Earlier this Court found that Prudential has demonstrated continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation. But even if the facts in this case do not fit neatly within this rubric because the debtors are not engaged in business, the Court is satisfied that cause exists here for conversion to Chapter 7. The Court believes that continuation of this case in Chapter 11 is incompatible with the objectives of the bankruptcy law which is concerned with the protection of creditors as well as the relief of debtors.

The exemptions available in Chapter 7 are intended to provide a debtor with what is needed for a fresh start and in New

York they are not ungenerous. They include a $20,000 homestead exemption. It is evidently the legislative view that any equity in excess of that figure should be made available to creditors. Recourse to Chapter 11 should not result in exemptions more generous than that provided under Chapter 7 unless some purpose peculiar to Chapter 11 is being served.

Chapter 7 offers the debtors what they need which is a fresh start and a future free from debt. They cannot wipe out their debts and leave their assets intact, which is what they are now trying to do. They cannot continue living in their former luxurious lifestyle while Prudential alone bears the cost of their speculative trading. This the law will not allow.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of the parties and the subject matter at issue pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. This is a core proceeding in accordance with 28 U.S.C. § 157(b)(2)(A).

2. Prudential has sustained its burden of proving that cause exists for converting this case. Prudential has proved continuing loss or diminution of this estate and absence of a reasonable likelihood of rehabilitation within the meaning of 11 U.S.C. § 1112(b)(1).

3. It is in the best interest of all the creditors in this estate that this case be converted for liquidation under Chapter 7 of the Bankruptcy Code.

4. Prudential's motion pursuant to 11 U.S.C. § 1112(b)(1) is granted in the extent that it seeks an order for conversion to a case under Chapter 7 of the Bankruptcy Code.

An Order consistent with this Opinion has already been issued.