**In re EXPRESS FREIGHT LINES, INC., Debtor.**

**Bankruptcy No. 89–02929–MDM.**

United States Bankruptcy Court, E.D. Wisconsin.

July 13, 1990.

David Loeffler, Milwaukee, Wis., for debtor re Collective Bargaining Issue.

Elizabeth Roberto, Bloomfield Hills, Wis., for Creditors' Committee.

Frederick Perillo, Milwaukee, Wis., for Union re Collective Bargaining Issue.

Dayten P. Hanson, Milwaukee, Wis., for Express Freight re Creditors' Committee's motions.

## MEMORANDUM DECISION

M. DEE McGARITY, Bankruptcy Judge.

Express Freight Lines, Inc. can best be described as a debtor under siege. This court is now called upon to decide the debtor's motion to reject a collective bargaining agreement, the creditors' committee's motion to appoint a Chapter 11 trustee or, alternatively, to convert the case to one under Chapter 7. These motions are core proceedings under 28 U.S.C. § 157(b). These matters were consolidated for this decision because much of the same evidence was needed to determine the outcome of each motion. Also, the outcome of each has a significant impact on how the other motions are decided. Altogether, hearings consumed eleven days of trial. The amount of evidence that all parties, including the debtor, regarded as important for the court's consideration was substantial, as was the trial time necessary for its presentation. For this reason, and because the debtor is not presently engaged in any trucking operation, the debtor agreed not to reject the collective bargaining agreement until a decision was made by this court, notwithstanding the time constraints of 11 U.S.C. § 1113(d).

For the reasons stated herein, the court denies the debtor's motion to reject the collective bargaining agreement, grants the creditors' committee's motion to convert, and denies the motion to appoint a Chapter 11 trustee.

## FACTS

The debtor has been in existence for many years as both a truckload ("TL") and less than truckload ("LTL") motor carrier of general freight. It owned its own rolling stock and employed Teamster union drivers. Both dry van and flatbed trailers were used.

The TL and LTL divisions were operated as separate divisions of the same company. The two types of operations differ significantly. In a TL operation the carrier carries goods from a point designated by the shipper, perhaps a factory or warehouse, and takes them to their final destination. The shipper contracts for use of the entire tractor and trailer to ship its goods. All of the goods are put on the trailer at the point of origin and are unloaded at the destination without intermediate stops or handling.

The LTL operation requires a much more complicated setup. The shipper contracts for loads that do not require use of the entire trailer. This leaves room for goods of more than one shipper on a single trailer, and the shipments will have different locations for pickup and delivery. Efficient handling of the different shipments requires coordination of trucks and partial loads going in the same general direction. Express owned terminals spread throughout the five state area that it served.[1] Trucks might carry a shipment part of the way and then unload at one of these terminals. The goods would be reloaded on oth-

1. Wisconsin, Illinois, Michigan, Indiana and Ohio.

er trucks headed for their destinations, much in the same way airline passengers change planes in an air terminal. Compared to a TL operation, significantly more planning of routes, more labor for handling goods and more physical facilities for route connections and storage are required.

Before deregulation of the trucking industry in 1980, the debtor enjoyed a comfortable niche in the marketplace. Then as it became easier to enter the field, competition forced prices down. By 1985, the company had an operating loss of over $1,600,-000 on gross revenues of $17,000,000. 1986 was better, but the company still operated at a loss, and revenues were sinking. Although the accuracy of the financial statements during this period was challenged (more about that later), all agree that the company was in serious trouble.

On December 18, 1988, Thomas Moore, the owner of Express Freight Lines, Inc. sold the company to Federated Freightways, Inc. The new principals were Christopher Jansen, Gilbert Granet, and William Moses. Soon after the sale, changes were made in office procedures, as is often the case when ownership changes. The changes, however, resulted in the exodus of even greater amounts of cash from a company that already had significant cash flow problems. Jansen kept complete control of cash disbursements, and the parent company and Mr. Moore were paid substantial sums even though vendors, taxing authorities and employee benefit plans were not. Management personnel began to exit, often not by choice. This Chapter 11 filing was all but inevitable. All trucking operations ceased at filing on June 16, 1989.

One person not adversely affected by the financial woes of the company is James Wichert. He was hired on March 28, 1988, as controller at the initial annual salary of $38,000. He later became Vice President of Finance and Administration and, by the time of filing, was earning $60,000 per year. This was cut back to $55,000 after filing.

Soon after being hired Wichert discovered the magnitude of losses being incurred. He also found that accounting practices were grossly substandard. He attempted to improve procedures and to find out just where losses were greatest. He instituted terminal profit and loss statements to help identify unproductive terminals. In response to information he gained, the Detroit, Indianapolis and Grand Rapids terminals were closed. He attempted to revise methods of allocating overall expenses between divisions and to devise better pricing techniques that would be in line with costs. It was too late.

As the Chapter 11 progressed, Jansen and Granet took less active roles (Moses never was active in running the business), and Wichert was made President in November, 1989. He continues to be so employed.

Even though trucking operations stopped, there was plenty for Wichert and his staff to do after filing. Rolling stock had to be collected from over the five state area and sold. Remaining terminal real estate had to be sold. The business records had to be moved out of the Milwaukee terminal facility and new offices set up. Records of receivables were needed by the factoring company that had been collecting for the company and advancing funds. A receivables audit instituted by Wichert revealed that the business was entitled to thousands of dollars that had never been billed. The debtor in possession also employed a freight auditor to collect undercharges for receivables already billed and collected when the amount billed was less than the published tariffs.

Sale of real and personal property brought a net of approximately $100,000 into the estate, and the freight auditors have produced a net of $65,000 so far. Collections by the debtor, the factoring company and the freight auditor are ongoing. A settlement concerning cash held by a secured creditor brought $122,500 into the estate. Disputes over a promissory note due the debtor that may be subject to a setoff claim and interests in a separate escrow account, potentially totalling over $100,000 for the estate, have yet to be resolved, but Wichert expects substantial recoveries. He also believes there may be as much as $250,000 in recoverable prefer-

ences. In short, the total promises to be a tidy sum.

On the other hand, administration expenses for professional fees already incurred and applied for are breathtaking. Furthermore, there are priority claims, including taxes in excess of $700,000. The attorney for the creditors' committee acknowledged that unless most or all of the tax liabilities are satisfied by responsible individuals, the unsecured creditors will receive nothing upon liquidation. An unsecured creditor, who is a member of the committee, testified that they still wish to have the case converted. The committee believes the cash that has and will be recovered is being squandered, and the debtor cannot mount an effective reorganization. Alternatively, the committee asks for a Chapter 11 trustee whom it believes will liquidate the remaining assets at much less expense.

Wichert proposes to reopen Express in a form that is substantially different from the old company. The new Express would have three divisions, only one of which would employ union drivers, hence the motion to reject the collective bargaining agreement. During the pendency of this case, employees of the debtor in possession have been laying the groundwork for this new company so it could open as soon as the court determines that it can do so with nonunion divisions. The union's position is that all divisions would be covered by the union contract.

Additional facts will be set forth in the discussion portion of this decision.

## COLLECTIVE BARGAINING AGREEMENT

Express had been a union company for many years. Most of their drivers at the time of filing were long term employees with significant interests in the union pension fund. From April 1, 1985, to March 31, 1988, the applicable union contract was the National Master Freight Agreement Covering Over–the–Road and Local Cartage Employees of Private, Common, Contract and Local Cartage Carriers and the Central States Area Iron and Steel and Truckload Supplement Covering Drivers Employed by Private Common and Contract Carriers. This was known as the Black Book. Before this agreement expired, Express gave notice as required by the agreement of its intention to withdraw from the multi-employer bargaining unit and to negotiate a separate contract. Later, on April 19, 1989, it signed an Interim Agreement whereby it bound itself to the new multi-employer master agreement then in the process of negotiation. When complete, this agreement and supplement, which have the same scope as the Black Book, became known as the Red Book. The Red Book is in effect for the period April 1, 1988, through March 31, 1991. Therefore, the debtor was operating under the Red Book at the time of filing.

The debtor wishes to reject that collective bargaining agreement under the authority of 11 U.S.C. § 1113.[2] Section 1113

---

2. § 1113. Rejection of collective bargaining agreements.

(a) The debtor in possession, or the trustee if one has been appointed under the provisions of this chapter, other than a trustee in a case covered by subchapter IV of this chapter and by title I of the Railway Labor Act, may assume or reject a collective bargaining agreement only in accordance with the provisions of this section.

(b)(1) Subsequent to filing a petition and prior to filing an application seeking rejection of a collective bargaining agreement, the debtor in possession or trustee (hereinafter in this section "trustee" shall include a debtor in possession), shall—

(A) make a proposal to the authorized representative of the employees covered by such agreement, based on the most complete and reliable information available at the time of such proposal, which provides for those necessary modifications in the employees benefits and protections that are necessary to permit the reorganization of the debtor and assures that all creditors, the debtor and all of the affected parties are treated fairly and equitably; and

(B) provide, subject to subsection (d)(3), the representative of the employees with such relevant information as is necessary to evaluate the proposal.

(2) During the period beginning on the date of the making of a proposal provided for in paragraph (1) and ending on the date of the hearing provided for in subsection (d)(1), the trustee shall meet, at reasonable times, with the authorized representative to confer in good

was made part of the Bankruptcy Code as a Congressional response to the Supreme Court's decision in *NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984). *Bildisco* held that a collective bargaining agreement is an executory contract under 11 U.S.C. § 365(a) and as such could be rejected by a debtor. Instead of the usual "business judgment" standard applied to rejection of other contracts, the Court adopted the standard from *In re Brada Miller Freight System, Inc.,* 702 F.2d 890 (11th Cir.1983), which held that a bankruptcy court should permit rejection only if the debtor can show that the agreement burdens the estate and the equities balance in favor of rejection. *Bildisco,* 104 S.Ct. at 1196. In so holding, the Court rejected the strict standard adopted in *Brotherhood of Railway, Airline & Steamship Clerks v. REA Express, Inc.,* 523 F.2d 164 (2nd Cir.), *cert. den.* 423 U.S. 1017, 96 S.Ct. 451, 46 L.Ed.2d 388 (1975); that is, that the business will fail unless rejection is permitted.

The statute sets forth a process that a debtor must follow before it will be allowed by the court to reject a collective bargaining agreement. The portion of *Bildisco* that allowed rejection before court approval was effectively overruled by the new statute. Along with the procedure that the debtor and union must follow before a motion to reject can be considered, the statute codified the equitable standards required by *Bildisco* for rejection. Section 1113 is, however, a product of conference and compromise. Although the statutory language was finally agreed to, there was not a consensus on how the standards would be applied. Consequently, there is no committee report, and the legislative history consists primarily of comments made by legislators (principally Senators Packwood and Thurmond, who represented opposing points of view on what the standards for rejection should be) who were not speaking for the committee as a whole. This legislative history is described in detail in *Wheeling–Pittsburgh Steel Corporation v. United Steelworkers of America, AFL–CIO–*

faith in attempting to reach mutually satisfactory modifications of such agreement.

(c) The court shall approve an application for rejection of a collective bargaining agreement only if the court finds that—

(1) the trustee has, prior to the hearing, made a proposal that fulfills the requirements of subsection (b)(1);

(2) the authorized representative of the employees has refused to accept such proposal without good cause; and

(3) the balance of the equities clearly favors rejection of such agreement.

(d)(1) Upon the filing of an application for rejection the court shall schedule a hearing to be held not later than fourteen days after the date of the filing of such application. All interested parties may appear and be heard at such hearing. Adequate notice shall be provided to such parties at least ten days before the date of such hearing. The court may extend the time for the commencement of such hearing for a period not exceeding seven days where the circumstances of the case, and the interests of justice require such extension, or for additional periods of time to which the trustee and representative agree.

(2) The court shall rule on such application for rejection within thirty days after the date of the commencement of the hearing. In the interests of justice, the court may extend such time for ruling for such additional period as the trustee and the employees' representative may agree to. If the court does not rule on such

application within thirty days after the date of the commencement of the hearing, or within such additional time as the trustee and the employees' representative may agree to, the trustee may terminate or alter any provisions of the collective bargaining agreement pending the ruling of the court on such application.

(3) The court may enter such protective orders, consistent with the need of the authorized representative of the employee to evaluate the trustee's proposal and the application for rejection, as may be necessary to prevent disclosure of information provided to such representative where such disclosure could compromise the position of the debtor with respect to its competitors in the industry in which it is engaged.

(e) If during a period when the collective bargaining agreement continues in effect, and if essential to the continuation of the debtor's business, or in order to avoid irreparable damage to the estate, the court, after notice and a hearing, may authorize the trustee to implement interim changes in the terms, conditions, wages, benefits or work rules provided by a collective bargaining agreement. Any hearing under this paragraph shall be scheduled in accordance with the needs of the trustee. The implementation of such interim changes shall not render the application for rejection moot.

(f) No provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this section.

*CLC*, 791 F.2d 1074 (3rd Cir.1986), and in a series of cases from the Second Circuit. *In re Royal Composing Room, Inc.*, 848 F.2d 345 (2nd Cir.1988); *Truck Drivers Local 807, International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America v. Carey Transportation, Inc.*, 816 F.2d 82 (2nd Cir.1987); *In re Century Brass Products, Inc.*, 795 F.2d 265 (2nd Cir.1986). *See also* Gibson, "The New Law on Rejection of Collective Bargaining Agreements in Chapter 11: An Analysis of 11 U.S.C. § 1113," 58 Am. Bankr.Law Jrnl. 325 (1984).

The court must review the content of the debtor's proposed modification of the collective bargaining agreement and the conduct of the parties relative to how the agreement was presented by the debtor to the union. Section 1113 has set out the procedure in rather cumbersome prose that was broken down by Bankruptcy Judge Robert J. Kressel as follows:

1. The debtor in possession must make a proposal to the Union to modify the collective bargaining agreement.

2. The proposal must be based on the most complete and reliable information available at the time of the proposal.

3. The proposed modifications must be necessary to permit the reorganization of the debtor.

4. The proposed modifications must assure that all creditors, the debtor and all of the affected parties are treated fairly and equitably.

5. The debtor must provide to the Union such relevant information as is necessary to evaluate the proposal.

6. Between the time of the making of the proposal and the time of the hearing on approval of the rejection of the existing collective bargaining agreement, the debtor must meet at reasonable times with the Union.

7. At the meetings the debtor must confer in good faith in attempting to reach mutually satisfactory modifications of the collective bargaining agreement.

8. The Union must have refused to accept the proposal without good cause.

9. The balance of the equities must clearly favor rejection of the collective bargaining agreement.

*In re American Provision Co.*, 44 B.R. 907, 909 (Bankr.D.Minn.1984).

The debtor has the ultimate burden of proof on all issues. However, the Union has the burden of production of evidence that the debtor has not complied with elements numbered 5, 7 and 8 once the debtor has presented evidence that it has complied. *Id.* at 909–10.

Wichert approached the Union in September, 1989, and informed them of his desire to restart operations in a new form. He also developed a business plan which he presented to the Union in October, and later to the creditors' committee in November, 1989. The plan, including projections of income and expenses, was substantially the same as that presented to the court. In summary, the new Express Freight Lines, Inc. would be strictly a truckload operation. It would have three divisions. The first would be an owner/operator division serving the traditional five state area. Instead of owning its own fleet, Express would hire drivers who own their own equipment. Express would lease the equipment. It might also lease fleets and hire drivers. The drivers hired by this division would be employees of Express and would be Teamster members.

The second division would be the brokerage division. This division would service customers out of the five state area and would use independent contractors who were not employees and were not union members. Wichert believed this was necessary because until sufficient business was built up over long trucking lanes, the debtor could not offer protections the union contract provides for delays and could not guarantee freight for return trips. As long lane business increased, these lanes would be brought into the employee owner/operator division.

The third division, the subcontract/administrative services division,

would provide business services for small fleet or single truck independent owner/operators. Express would take care of insurance, payroll, permits, tax reporting and similar administrative matters in exchange for a percentage of revenue. It would not solicit freight. The small business owner would be relieved of administration and could concentrate on trucking. These clients would operate under Express' insurance and operating authority, and the drivers would not be union members. If Express' operating authority was used, the drivers might be considered co-employees.

Wichert informed the union that concessions would be necessary both to provide for these two nonunion divisions and to provide reduced compensation to union members to start the owner/operator division.

After meeting with Teamster representatives for presentation of the business plan and receiving an unenthusiastic response by the union, counsel on both sides became involved. An amended proposal was presented, and the debtor supplied the union with numerous documents such as ICC annual reports, audited financial statements, internally generated financial statements and other documents. Meetings took place on January 28 and 29, 1990. A Second Amended Proposal was presented to the union on January 31, 1990, and two more meetings took place on February 2 and 3. The Teamsters made a counter proposal on February 3. The debtor presented the Third Amended Proposal on February 12, 1990, and the Teamsters countered with an amended counterproposal on February 13. The debtor came back with its Fourth Amended Proposal on February 13 and a Fifth Amended Proposal on February 14, 1990. The last meetings were held on February 13 and 14. After the last meeting, the debtor presented its Sixth Amended Proposal. Thereafter, the debtor filed its motion to reject the collective bargaining agreement on February 21, 1990. Finally, the debtor submitted its Seventh Amended proposal on March 5, 1990.

Obviously, the debtor met its first obligation under the *American Provision* standards by making a proposal, and it met with the union at reasonable times before filing its motion, requirement number six. This court is satisfied that the proposal was based on the most complete and reliable information available to the debtor at the time the various proposals were made, thereby fulfilling the second requirement. The union argued that the debtor did not fulfill the fifth requirement, which is closely related to the first two, to provide adequate information to allow the union to evaluate the proposals. Undeniably, the trial resulted in the production of numerous exhibits and financial analyses that the union had not seen before. However, it appears that much of this material was being generated as the proceedings progressed, and the debtor was producing the most complete and reliable information available at relevant points in time. Therefore, the debtor met the fifth *American Provision* requirement.

After the stage is set with the presentation of the proposal and information to evaluate it, the content of the proposal and the conduct of the parties relative to its negotiation must be analyzed. One of the first issues presented was which of the debtor's proposals to consider. The Sixth Amended Proposal was presented to the union after the last negotiating session, and the Seventh Amended Proposal was presented after the motion was filed but before hearings commenced. The union negotiated in good faith throughout its meetings but counsel flatly refused to negotiate the Seventh proposal, stating that it had no duty to do so once hearings commenced, citing 11 U.S.C. § 1113(b)(2). Counsel insisted that the last proposal negotiated, the Fifth, should be the one considered by the court. This view is supported by *In re Mile Hi Metal Systems, Inc.*, 899 F.2d 887 (10th Cir.1990), although the facts are distinguishable. *Mile Hi* dealt with statements made *during* the hearing, whereas the Seventh proposal was made a week *before* the first day of hearing. We likened the amended proposal to an amended complaint that relates back to the filing of the

motion. Certainly there would have been time to negotiate the Seventh Amended proposal as there were many days between the numerous days of hearings. As events developed, the portions of the Sixth and Seventh proposals that related to the debtor's financial condition did not change, so it is of no consequence which proposal is considered. It certainly would not change the result in this case. Nevertheless, this court is not convinced that 11 U.S.C. § 1113(b)(2) need be interpreted to refer only to the first day of a hearing covering several days. It could mean that the court reviews the parties' conduct before the hearing in which relevant testimony is taken. In *Mile Hi*, it appears that events were transpiring at a much faster rate, and a sharper focus might have been necessary. Here, the debtor was not operating, and that urgency did not exist.

In light of the strong national policy favoring negotiation, we doubt that Congress meant to cut off the process, especially when one side still wishes to negotiate, as the debtor did here. *See Carey Transportation* at 92. It certainly flies in the face of the policy favoring settlement rather than judicial resolution of disputes. In *Century Brass*, the Second Circuit noted that *Bildisco* did not require the parties to bargain to impasse before filing a motion to reject the collective bargaining agreement "since determining whether an impasse had occurred would take the bankruptcy court outside the area of its expertise." *Century Brass* at 272. If the motion to reject can be filed before impasse, surely the parties should continue to negotiate. The bankruptcy court in *Carey Transportation* tried to keep the parties talking while hearings progressed, and even in *Mile Hi* the bankruptcy court adjourned the proceedings to allow further negotiation. The *Mile Hi* court further found that the union must continue to negotiate, notwithstanding the fact that the debtor's proposal contains provisions that would be illegal under labor law, a clear statement mandating continuing negotiations if there ever was one. Once the hearing started, the union's attorney stated that unless the debtor withdrew its motion,

he would not discuss settlement or the Seventh Amended proposal, which he had received the previous week. He made clear that his goal was to make sure the debtor never restarted operations. This refusal demonstrates the union's lack of good faith and its commitment not to reach a consensual resolution to the problems facing both the debtor and its proposed union employees.

If the union wins no prizes for its behavior, the debtor comes in even farther behind. Section 1113 is clear that the proposal must be necessary for the debtor's reorganization, *American Provision* requirement number three. The primary focus in the cases and commentary is the meaning of the word "necessary" as it is used twice in 11 U.S.C. 1113(b)(1)(A). The Third Circuit found that the legislative history supported an interpretation that "necessary" meant "essential," and the business could not continue without the rejection. *Wheeling–Pittsburgh* at 1088–89. This is close to the *REA* standard. The case also cites Gibson, *supra*, for the proposition that every provision that is modified must meet this standard. *Id.* at 1088. The court noted that the changes must not only be necessary, they must be necessary "to permit the reorganization of the debtor," and the court should not be focusing on the long term financial prospects of the business. 11 U.S.C. § 1113(b)(1)(A); *Wheeling–Pittsburgh* at 1089.

The Second Circuit found that the concept of "necessary" is not so restrictive. The court must consider "whether rejection would increase the likelihood of successful reorganization." *Carey Transportation* at 89. Citing *Carey Transportation*, the court in *Royal Composing Room* found that "necessary" does not mean "absolutely minimal," a standard that would require the debtor to prove that each and every modification is vital to the reorganization. *Id.* at 348. Such a standard would make good faith negotiation impossible; negotiation assumes that parties can move from their original position. Any movement would be impossible if every element of the proposed modification is independently es-

sential. The overall modification package must be necessary, but this relaxed standard is more practical than the piecemeal approach suggested by *Wheeling–Pittsburgh.* Since there may be more than one way to reach a desired goal, this Second Circuit analysis is more compatible with the negotiation process, long considered the preferred method of working out labor disputes.

The Tenth Circuit confined itself to the words of the statute because it found the legislative history to be unreliable in that it was " 'scant and capable of differing interpretations,' " *citing Miller v. Commissioner,* 836 F.2d 1274, 1282–83 (10th Cir.1988). *Mile Hi,* at 890. The *Mile Hi* court agreed with the Second Circuit, citing *Carey Transportation* for the proposition that the modifications must be more than potentially helpful but not absolutely minimal. *Mile Hi* at 893. The Court also stated the goal should be an economically viable entity over the long term, not merely one that can survive reorganization. *Id.* The concurring opinion of Judge Seymour noted that too strict an interpretation of "necessary" would make good faith bargaining impossible. *Id.* at 895. However, the court recognized strong national policies favoring the enforcement of collective bargaining agreements. The debtor's proposal must have only modifications that are directly related to its financial condition. It should not use the § 1113 process as an opportunity to make other changes. *Mile Hi* at 893.

The debtor points out that this court is not bound by any of the above circuits and urges the adoption of an even looser standard for a "necessary" proposal, *i.e.*, one that would significantly improve the competitive position of the debtor. That is too lenient and is incompatible with any sensible interpretation of the word "necessary." Presumably any modification in a collective bargaining agreement would be to the debtor's advantage and would make more funds available for operations or to fund the plan; otherwise, it would not be proposed.

None of the circuit cases have attempted to quantify "necessary." Should the changes be considered necessary if they give the debtor an 80% chance of success, or should changes be allowed only to the extent necessary to give the debtor a 51% chance of success? We do not believe such fine lines can be drawn when attempting to assess the likelihood of reorganization. The Second/Tenth Circuit approach appears to be most practical; that is, in addition to the other elements of 11 U.S.C. § 1113, the court must find the debtor's overall proposal makes changes in the collective bargaining agreement that relate only to its financial condition, and without these changes, the reorganization would be unlikely. This sounds slightly stronger than the *Carey Transportation* standard of "whether rejection would increase the likelihood of successful reorganization," but it appears to be what that court meant. *See Carey Transportation* at 89. We also believe that "successful reorganization" means continuing beyond the immediate future.

To be necessary to the reorganization, the modifications must be related to the debtor's financial condition. *Mile Hi* at 893. Several of the debtor's proposals had nothing whatever to do with its reorganization. For example, the debtor wanted eliminated from the Red Book the requirement that a buyer of the debtor's assets be bound by the collective bargaining agreement. A sale is not part of the debtor's business plan submitted to the court. Another proposed change involved the Red Book grievance procedure, which has nothing to do with a successful reorganization. The debtor also proposed a change in the seniority status of employees of an acquiring company and an acquired company, even though the debtor anticipates buying no other trucking company. Wichert described these proposed changes as "excessive baggage" in the agreement. If they were irrelevant, the clauses could hardly be "necessary" modifications that are "necessary" for the reorganization. 11 U.S.C. § 1113(b)(1)(A). Eventually the debtor backed off of insisting on these irrelevant changes, but presenting them in the first

instance calls the debtor's good faith into question, thereby running afoul of *American Provision* requirement number seven as well as three.

Even if the court might be inclined to overlook the irrelevant provisions because the debtor eventually backed down, the debtor still did not meet its burden of proof for requirement number three; that is, the proposed modifications relating to the debtor's financial condition must be necessary to permit the reorganization of the debtor. Wichert testified that the TL division had not been profitable under the Red Book, so the new employee owner/operator division would need economic concessions in the form of reduced wages and benefits to restart. In fact, if the debtor is not authorized to reject the agreement, he stated that it would liquidate. On the other hand, a former employee and the union negotiator both testified that Wichert had previously told them the TL division had been profitable. Financial reports of the TL division also showed that it turned a considerable profit and made large contributions to general overhead, although Wichert attempted to show that those reports were unreliable. His assertions in this respect are quite remarkable in light of the fact that he was responsible for their preparation. He said that wages should be a consistent percentage of revenue, but the amounts actually fluctuated. It appears to the court that this could occur because of timing of payment of drivers in a different month from when the revenue was received. Wichert also maintained that insufficient overhead was allocated to the TL division. While there may have been some allocations of general overhead or expenses that were missing or not technically correct, the court was persuaded that he was trying to put too much overhead in the TL division than was warranted. The relative burdens of the TL and LTL divisions for general overhead should not be pro rata based on gross revenue. The TL division did not require as much administration as the LTL division. It appears then that the TL division had indeed been profitable, or at least had not lost money, while operating under the Red Book.

Wichert's allocation of overhead in his projections for the owner/operator division does not ring true. He projects gross revenues of approximately $1.5 million in the first year of operation for this division and $4.5 million for the brokerage and administrative divisions; but over half of his salary is allocated to the owner/operator division. If he will be working to generate quick cash from administrative services and to build up long lanes so these can be added to the owner/operator division, it seems more appropriate that a larger share be in those divisions. The owner/operator division in general seems to bear a disproportionately large amount of the overhead in other areas as well ($22,500 for travel and entertainment in the first year). It does not follow that the union division should account for only about 25% of gross revenues, but bear substantially more of the overhead, unless the union owner/operator division is being heaped with expenses to support a need for economic concessions.

Wichert's reasoning in proposing that the brokerage division be nonunion did not make practical sense to this court. The Red Book authorizes use of nonunion independent contractors if all union members are working. Union employees must be added if this overflow reaches a certain level. A deadhead (empty) return trip is allowed unless the driver is dispatched to another location, in which case the deadhead miles must meet a certain formula. In other words, all Express would have to do is offer a haul to its employees. If they all turned it down because it was out of the five state area and would require a long deadhead, it could be offered to nonunion independent contractors, the very people Wichert contemplates for this division. Wichert intends to start with three to fifteen employee owner/operators. This means that to offer a haul to union members, the dispatcher would have to call at most fifteen people at first, less any that the dispatcher knew were not available because of scheduled runs. Since the contract ends March 31, 1991, and Express could again withdraw from the multi-employer bargaining unit, the number of em-

ployees the dispatcher would be required to contact would not be so high as to make these calls the unreasonable administrative burden that Wichert claimed it would be. He wants to maintain "flexibility" for growth, but we are still mystified why the brokerage division must be nonunion to promote this flexibility. Therefore, Wichert's reason for making the brokerage division nonunion is wholly inadequate, and this court finds that exclusion of this division from the collective bargaining agreement is not necessary for the debtor's reorganization.

As a former controller, Wichert's forte is financial analysis, and this court received reams of analyses on the debtor's proposal for compensation versus the Red Book's rates, the union's counterproposal rates and the union's profit sharing proposal (a type of "snap back" proposal whereby the employees and the company would share profits over a certain amount). All of these were initially expressed as a percentage of income, a form of compensation authorized by the Red Book. Wichert testified that this is the fairest way of compensating drivers and keeps the employers fixed costs and risks at a minimum. He believed that a higher percentage than the Red Book called for should be paid for rental of tractors but a lower than Red Book percentage should be paid as wages and for rental of trailers. Health, welfare and pension benefits were reduced, and the drivers would be required to bear the cost of most tolls and permits. Wichert converted other costs such as payroll taxes and insurance to a percentage of revenue and concluded that the percentages added up to more than 100%, in which case the business could not go forward. If we accept his premise, the court would be forced to the conclusion that no one could operate under the Red Book. Nevertheless, both the debtor's and the Teamster's experts testified that there are indeed companies operating at a profit under the Red Book. It appears then that if the debtor, starting from scratch without real estate or other encumbered property, could not conceivably do so as well, then the problem is not in the Red Book.

The Red Book also provides that driver owner/operators can be compensated based on miles traveled rather than on a percentage of revenue. Wichert argued that this method of compensation is not favored by the drivers he would like to attract. He showed that the cost to the owner of running a tractor and trailer is more than the owner would receive under the mileage method, given certain assumptions on how the owners might have financed the equipment purchase and the number of miles per year for a medium length haul company as Express is intended to be. As a consequence, Wichert argued that a truck owner could not cover his/her cost of operation and, therefore, would not work for Express. Wichert's own calculations show there is a fairly substantial profit to be made by the debtor using the mileage method, if his projections for revenues come true. Assuming he makes these projections, he demonstrated that rental of equipment would cost the debtor less under the Red Book mileage method than it would cost under the debtor's percentage of revenue proposal. So why not use the Red Book mileage method and not reject the contract? How can the debtor argue that rejection is necessary for a reorganization if it proposes to pay more than the Red Book mileage method requires? If the Red Book is merely a minimum, why not pay more than the contract requires and keep the union happy? Although Wichert felt that the Red Book mileage rates for rental of equipment are substandard, the Teamster's economist testified that there are companies similar in type to the proposed Express that attract owner/operators and do not have high turnover or dissention problems. The mileage method could have an added benefit for the debtor in that any revenue that could be negotiated over the amount needed to cover the mileage costs would go directly to the debtor, thereby increasing profits and plan payments. Wichert acknowledged that it would be possible to devise a compensation system taking other factors into consideration, such as deadhead miles or layover time, but he liked the percentage of revenue system bet-

ter. This is not sufficient reason to make rejection of the collective bargaining agreement "necessary." Once again the debtor has failed to meet its burden of proof for *American Provision* requirement number three.

Requirement number four is that the debtor's proposal be fair and equitable to all affected parties. 11 U.S.C. § 1113(b)(1)(A). This requirement " 'does not authorize freewheeling consideration of every conceivable equity, but rather only how the equities relate to the success of the reorganization.' " *Carey Transportation* at 92–93, *citing Bildisco*, 465 U.S. at 527, 104 S.Ct. at 1197. The burdens of the debtor's reorganization must be borne by workers, management and creditors, and no one group should be disproportionately affected. Prepetition concessions or cutbacks can be considered in determining what was fair. *Carey Transportation* at 90. Here Wichert took only a small cut in pay, which he intends to reinstate upon confirmation of the plan. Other former employees, now working on the administration of the estate and possible start-up, got raises and new job descriptions after filing, which were totally unwarranted for a non-operating company. Generous raises are projected for the near future for management, presuming, of course, that projected revenues are met. But the debtor rejected the union's counter proposal for a profit sharing plan if anticipated profits are realized. This means that management would share in the debtor's good fortune, but the drivers would not. Or perhaps the creditors would share by being paid earlier than anticipated. While this court does not share the *Wheeling–Pittsburgh* view that a "snap back" provision is necessary, it is an example of unfairness in this proposal. Consequently, the debtor has not met its burden of proof with respect to *American Provision* requirement number four.

Obviously, if the court finds that the debtor's proposal is not necessary to its reorganization and is not fair to all concerned, it follows that the union rejected the proposal with good cause. Indeed, the union's negotiator, Carlow Scalf, had sensible and thoughtful reasons for every provision he refused to accept. For example, he rejected a proposed cut in pension benefits because it would not be allowed by the plan. A representative of the Central States, Southeast and Southwest Areas Pension Fund corroborated this fact. To lower the benefits of an employee whose rights had vested at a certain level, which would be necessary if payments were lower, would be contrary to the plan. Also, Scalf believed that allowing two nonunion divisions, the brokerage and administrative services divisions, was an invitation to draw freight away from the union division. This could occur because the administrative services division would be running under Express' operating authority and insurance and using Express' invoices. The independent operator and Express would be indistinguishable to the customer, and the shifting of freight to the nonunion carrier would be easy. Wichert felt that he could not attract administrative clients if they were required to be union; this may be true. Nevertheless, this potential threat to the union's position is good cause for it to refuse to accept the modification. Similarly, freight could be shifted from the employee owner/operator division to the brokerage division. Wichert's refusal to offer freight going in or out of the five state area to union employees could have this result when there might be a union member willing to take a haul. Although the debtor agreed to a guaranteed portion of freight being moved by union employees, Scalf stated that in his experience, "double breasted" operations, those having both union and nonunion divisions, still tend to crowd out union divisions. Scalf saw no reason to change other provisions eventually conceded by the debtor, such as successorship, seniority and grievance provisions, given the debtors plans and circumstances. Neither does this court. Again the debtor did not meet its burden of proof with respect to *American Provision* number eight in that the union refused to accept the debtor's proposal without good cause.

Finally, since this court finds that the debtor's proposal to reject the collective bargaining agreement contains modifica-

tions that are not necessary to the debtor's reorganization, the modifications are not fair to all affected parties, and the union rejected the modifications with good cause, then it follows that the debtor has not met its burden of proof on requirement number nine; that is, the balance of equities does not favor rejection. *American Provision* at 909.

## CONVERSION

The court's finding that the debtor has not met its burden of proof for rejection of the collective bargaining agreement does not mean that this court is convinced that the debtor can succeed in its reorganization. On the contrary, we are satisfied that it cannot. Therefore, we will order that this case be converted to one under Chapter 7. A Chapter 7 trustee should be appointed immediately.

■■ Section 1112 provides a nonexhaustive list of grounds for conversion or dismissal. At the preconfirmation stage, the reasons most pertinent to this case include (1) continuing loss to or diminution of the estate and absence of a likelihood of rehabilitation; and (2) inability to effectuate a plan. 11 U.S.C. § 1112(b)(1), (2). When there are substantial assets that may be consumed unless a trustee is put in charge, conversion rather than dismissal is in order. *In re Silverstein*, 94 B.R. 284, 291 (Bankr.E.D.N.Y.1988).

Here, the debtor has been consuming about $18,000 per month in expenses, even though it is not operational. Granted that it has been preparing to be so, but that amount is still unreasonably high under the circumstances. The personal property has been sold, and receivables are being collected by the factoring company and the freight auditor. There has been no effort to economize, probably because the company is now largely liquid. Wichert has spared no expense in implementing his game plan, understandably so since it is not his money. Furthermore, Wichert estimates $45,000 to over $100,000 in start-up costs are needed for the business to become operational. This constitutes a continuing loss to and diminution of the estate. 11 U.S.C. § 1112(b)(1).

This court also finds that there is no likelihood of rehabilitation, *i.e.*, establishment of a sound financial basis. 11 U.S.C. § 1112(b)(1). *Collier on Bankruptcy* (15th ed.1990), ¶ 1112.03[d][i]. The projections for the new Express show a company that is unreasonably topheavy with well paid management. Such salaries might be justified for an established business, but Wichert's plan is brand new. Three quarters of its gross revenue in the first year, about $4.5 million, is projected to come from new divisions for which Express has no track record, and only one quarter would be derived from its established business. Such a plan is not realistic. While the debtor has pricing agreements with potential customers, these in no way obligate the customer to ship with Express. The debtor's expert, Mr. Armstrong, testified that the debtor could reach its projected growth of gross revenue, from $6 million to $26 million, in five years because it has an established name and historical customers; but this does not square with such a small portion of the business expected to come from its historical base.

Wichert asserted that Express needed to reject the collective bargaining agreement, and if not allowed to do so, the debtor would liquidate. His reasons for needing to reject were not supported by the evidence. This leads us to the conclusion that he is likewise not realistic in his assessment of the business' potential and in his ability to guide its future. He does not know what made the truck load division work in the past; he is not likely to be able to turn the remaining capital into a viable company in the future. "When visionary schemes for reorganization entail significant risk to creditors without any reasonable probability that the debtor can successfully rehabilitate, liquidation is generally in order." *Collier on Bankruptcy, supra* at 1112–18. *See also In re Kanterman*, 88 B.R. 26, 29 (S.D.N.Y.1988).

This court is also satisfied that Mr. Wichert and his staff are not the ones to carry out a liquidating plan. The assets have

been sold, and most of the winding up of the business has been done. No special expertise or familiarity with the business is required any longer. Wichert hired a salesman for the planned nonunion brokerage division in September, 1989, at $450 per week before there was any consultation with the creditors' committee or the union. His administrative assistant makes $540 per week and another salesman (who also has had other duties) makes $450 per week. This group would liquidate in luxury and at their leisure. They have nothing at stake in this debtor but their continuing employment. A Chapter 7 trustee is needed.

The court is also satisfied that the debtor is unable to effectuate a plan. 11 U.S.C. § 1112(b)(2). Wichert can point to no creditor class that will support a plan with current management at the helm. The creditors' committee is certainly opposed to Wichert's continuing control as it brought the motions to convert or appoint a Chapter 11 trustee. Wichert believes that if he can get underway, he will win over the unsecured creditors with positive operating reports. For the reasons stated throughout this decision, we believe his optimism to be completely unsupported by the evidence.

## CHAPTER 11 TRUSTEE

In light of the conversion of this case, the motion for appointment of a Chapter 11 trustee is denied.

This decision constitutes the court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. An order will be entered consistent with this decision.

## ORDER

For the reasons expressed in its memorandum decision of this date, IT IS ORDERED:

1. The debtor's motion to reject the collective bargaining agreement is denied.

2. The creditors' committee's motion to convert this case to a case under Chapter 7 is granted, effective immediately.

3. The creditors' committee's motion to appoint a Chapter 11 trustee is denied.