**In re John NOE, Carol Noe, Manta Noe, Debtors.**

**Bankruptcy Nos. 85–00912W, 85–00913W.**

United States Bankruptcy Court, N.D. Iowa.

July 15, 1987.

Dumbaugh & Childers, Cedar Rapids, Iowa, for debtors.

Eric W. Lam, Cedar Rapids, Iowa, for PCA of the Midlands & Farm Credit Systems.

John Titler, Cedar Rapids, Iowa, for Federal Land Bank, Creditors' Committee.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

### Re: Debtor's Plan Of Reorganization—Chapter 11

MICHAEL J. MELLOY, Bankruptcy Judge.

The matter before the Court is the confirmation of Debtors' Joint Plan of Reorganization. The Production Credit Association of the Midlands (PCA) is the objecting creditor. This is a core proceeding under 28 U.S.C. § 157(b)(2)(L).

### MEMORANDUM OF DECISION

Manta Noe owns 640 acres of farmland located in Black Hawk and Buchanan counties. For the past several years she and her son John and his wife Carol have farmed a crop and livestock operation on a 50–50 crop share basis. Debtors customarily plant 150 acres of soybeans and 350 acres of corn. The remaining land has been placed in the government reserve program and is devoted to hay, oats, pasture,

and timber. In addition to raising corn and beans, Debtors maintain a herd of 68 stock cows, 57 head of feeder cattle, and 80 calves.

Debtors filed their bankruptcy petitions under Chapter 11 on April 26, 1985. Their Joint Plan of Reorganization was originally submitted on August 23, 1985. It was initially amended on June 20, 1986.

Class 3 and Class 6, representing Federal Land Bank of Omaha and PCA, rejected the plan and filed written objections. Classes 7 and 8, representing the Commodity Credit Corporation, and Manta Noe of Class 10 filed ballots of acceptance. On January 29, 1987, a further plan amendment was filed reflecting a settlement reached between Debtors and Federal Land Bank. Changes in the Class 6 and Class 10 treatment of PCA were also incorporated. PCA remains the sole objector to the plan.

According to the "Partial Fact Stipulation" submitted by Debtors and PCA at the confirmation hearing, the allowed amount of PCA's secured claim is $306,156. The allowed amount of PCA's unsecured claim totals $60,321. John and Manta Noe are jointly and severally liable on the PCA debt. The parties further stipulate that Debtors have on-hand a total of $117,000 worth of cash and other property that is unencumbered and not exempt.

PCA's secured claim versus its collateral position, both pre-confirmation and post-confirmation, may be illustrated as follows:

| | PRE-CONFIRMATION | POST-CONFIRMATION |
|---|---|---|
| Allowed: | | |
| Secured Claim | $306,156 | $206,156 |
| Unsecured Claim | 60,321 | 60,321 |
| Collateral Value: | | |
| Cash Collateral | 69,000 | |
| Machinery & Equip. | 40,000 | 40,000 |
| Livestock | 45,000 | 45,000 |
| Real Estate: | | |
| Parcel A* | | 50,000 |
| Parcel B | 61,000 | 61,000 |
| Parcel C | 40,000 | 40,000 |
| Parcel D | 64,000 | 64,000 |
| (South 80 acres) | ——— | ——— |
| Total Collateral Value | $319,000 | $300,000 |

*Post-confirmation PCA equity resulting form cash-out of Federal Land Bank first mortgage on Parcel A.

As demonstrated by this table, PCA will maintain a post-confirmation equity cushion of approximately 30 percent.

The plan treats the allowed secured claim of PCA by payment on the date of confirmation of $100,000 in cash from a fund consisting of $69,000 in cash collateral (against which PCA has a valid lien) and $31,000 of unencumbered property. The balance of $206,156 is to be amortized in level payments over 25 years at an annual rate of 10 percent accruing from the date of confirmation. PCA's unsecured claim is treated by payment in 20 equal annual installments at the rate of 6 percent beginning on December 31, 1988.

## I. *Feasibility 11 U.S.C. § 1129(a)*

As evidence that their plan is feasible, Debtors introduced cash flow plans for the years 1986–1989. Current as of one week before the confirmation hearing, these plans estimate Debtors' income, both on-farm and off-farm, and expenses for each

year. They also include annual debt service statistics for the plan.[1]

In its post-hearing brief in support of its objection to confirmation, PCA contends that Debtors' plan does not meet the Bankruptcy Code's feasibility requirement. Section 1129(a)(11) provides that a bankruptcy court shall confirm a plan only if confirmation "is not likely to be followed by liquidation, or the need for further financial reorganization, of the debtor ... unless such liquidation or reorganization is proposed in the plan." PCA did not present evidence at the confirmation hearing to contest feasibility. In its brief, PCA's objection is based on information gathered from Debtors' 1983, 1984, and 1985 tax returns. According to its analysis of Manta Noe's Supplemental Income Schedule and John and Carol Noe's Schedule of Farm Income and Expenses, PCA concludes that Debtors' annual operational cash flows, as computed in their cash flow plans, are exaggerated. However, PCA has not introduced any evidence attacking the figures and computations in the cash flows. Since the cash flows are not facially unreasonable, the Court believes that the projections contained in the exhibits are accurate.

PCA also contends in its brief that the record is devoid of any testimony with respect to off-farm income that may be received by Debtors to service their plan debts. Therefore, concludes PCA, the Court should focus only on farm income when making its determination of feasibility. The fault in PCA's argument is manifested in the cash flow plans that were received into evidence on Debtors' motion. On page 2 of each exhibit, Debtors detail their "nonoperating farm income." Derived from Veterans Administration benefits, social security payments and stock dividends, this income provides a legitimate and substantial source of funds for debt service and is considered by this Court in its evaluation of feasibility.

In summary, the Court finds that Debtors' cash flow plans predict, as accurately as possible, Debtors' financial situation for the years 1987, 1988, and 1989. Debtors project a gross income of $206,936 and expenses of $105,385 in 1987, leaving an operating cash flow of $101,551. For the years 1988 and 1989, gross income is projected at $163,541, and expenses at $105,385 yielding $58,156 for an operating cash flow. Total debt service is $177,745 in 1987, and $30,442 in 1988 and 1989. Taking into account Debtors' net income, as well as cash on-hand available for debt service, Debtors seem well equipped to make the payments called for by the plan while maintaining a substantial balance over and above expenses and debt service.[2]

Furthermore, PCA's post-confirmation secured claim of $206,156 will be secured by collateral worth $300,000. Thus, PCA has an equity cushion of approximately 30 percent, substantially reducing its risk should Debtors default on their plan obligations. The plan, as backed by Debtors' projections in their cash flows, and additionally reinforced by the debt-to-equity ratio in PCA's collateral of close to 70 percent and the substantial accumulation of income since the date of filing, "offers a reasonable prospect of success and is workable," and, consequently, feasible, according to the standards of 11 U.S.C. § 1129(a)(11). *In re Monnier Brothers,* 755 F.2d 1336, 1341 (8th Cir.1985).

II. *Fair and Equitable Test 11 U.S.C. § 1129(b)*

PCA also objects that Debtors' plan is not "fair and equitable" because it does not provide for an adequate interest rate on the treatment of PCA's claim. 11 U.S.C. § 1129(b)(2). In determining interest rate adequacy, the Eighth Circuit has adopted a market rate approach. In order to provide the secured creditor with the present value of its claim as of the effective date of the plan, the interest rate on

---

1. The cash flows incorporate a 10 percent interest rate on Debtors' obligations to PCA.

2. Even looking solely at annual income, after a negative balance in 1987 (debt service includes payment to PCA of $100,000 immediately upon confirmation) Debtors should maintain a cushion of $27,714 in both 1988 and 1989.

deferred plan payments must take into account:

1. the quality of the security,
2. the length of the payment period and
3. the risk of subsequent default.

*In re Monnier Brothers*, 755 F.2d 1336, 1339 (8th Cir.1985).

A. *Secured Claim*

Debtors submit that the interest rate appropriately due on PCA's allowed secured claim is 10 percent. They base this figure on the expert testimony of economist Dr. Michael Sheehan. Dr. Sheehan implemented two approaches in arriving at the "most reasonable single figure" of 9.68 percent. Debtors' Exhibit 8. His first approach was based on the prime rate and the treasury bond rate, both adjusted for risk. The alternate approach analyzed corporate bonds with maturity dates and risk factors corresponding to the plan treatment of the creditor's secured claim.

While not unhelpful to the court in a plan interest rate dispute, expert testimony is not generally necessary to demonstrate adequacy. More important is a basic, easy to calculate methodology that establishes an interest rate that conforms to the *Monnier Brothers* standards.

The central concept of this methodology is the selection of an analogue appropriate to the "coerced loan" situation found in a reorganization context. *See Monnier Brothers* 755 F.2d at 1339. A suggested base rate can be determined by analyzing government securities with a duration equal to the term of the payment period proposed in the plan. This rate should be determined as of the date of confirmation to conform to the requirement that the secured creditor receive the present value of its claim as of the effective date of the plan. 11 U.S.C. § 1129(b)(2)(A)(i)(II). *Cf. Matter of Doud*, 74 B.R. 865 (Bankr.S.D. Iowa 1987) (submitted for publication).

One of the initially evident benefits of choosing government securities over other possible market rates is their accessibility. Yields on treasury bonds with up to 30–year maturity dates can be easily ascertained by reference to any recognized trade publication such as the Wall Street Journal. Because these bonds are traded and reported daily, the yields are current. *Doud*, at 868. An accurate base rate should obviate the need for complex expert testimony resulting in a higher degree of interest rate certainty before the parties commence the confirmation hearing. This greater degree of certainty enhances the accuracy of the plan's individual components, such as debt service statistics, and thus the plan as a whole, so that both objecting creditors and the court can make a more informed decision on plan viability. Furthermore, debtors maintain the flexibility necessary to formulate a plan of reorganization. They may, for example, choose to shorten the payment term thereby reducing the duration of the analogous treasury bond. The result, of course, would be a lower interest rate. Once the base rate has been chosen, the debtor will need to build-in an additional "risk premium" in order to satisfy the Eighth Circuit standards. The interest rate paid on government securities is relatively pure insofar as it does not include a risk component because the securities are not considered subject to default. *See In re Fisher*, 29 B.R. 542, 543 (Bankr.D.Kan. 1983). Obviously, the same is not true of the "coerced loan" situation in a Chapter 11 reorganization. Even though the issue of feasibility is thoroughly examined in a cramdown case, there is always some risk that the debtors will default on their plan obligations. This risk is particularly palpable in farm reorganizations under Chapter 11. The farming industry is inherently volatile; an individual farmer is always subject to numerous conditions beyond his control. The unpredictability of weather and government programs are but two of a host of problems inevitably encountered. This risk factor, usually about 2 percent, must be added to the base rate provided by the analogous government security. *See Doud*, at 869–70.

The risk in this case is particularly low. Looking at the quality of the security, the bulk of PCA's collateral consists of farm land. After receiving payment of $100,000 upon confirmation, PCA will maintain an equity cushion of approximately 30 percent.

The very existence of an equity cushion in a farm reorganization is rare in this district. As a whole, PCA's position as a secured creditor is quite strong; the risk premium should be correspondingly minimal.

On the other hand, PCA's expert, Thomas Watson, testified about the interest rate strategies of PCA and its lender, the Federal Intermediate Credit Bank (FICB). Mr. Watson testified that FICB's most current average cost of borrowing funds was approximately 8.5 percent. An additional percentage is added to this rate to account for, *inter alia*, contributions to capital and cost of services. As of February, 1987, PCA estimated its cost of funds, including this additional percentage, or "operating margin," at 9.9 percent.

■ Testimony regarding a creditor's cost of borrowing is relevant only in the context of determining the market rate for cost of funds. *See Monnier Brothers*, 755 F.2d at 1339. PCA has presented no evidence that its cost of funds is either above, below, or on target with the cost of borrowing on the open market. Mr. Watson testified that PCA's rate lagged behind the market rate; therefore, its figures cannot be accepted at face value. Furthermore, PCA admitted in its answers to interrogatories that the operating margin includes a provision for past loan losses. This loss element is inappropriate and should not be included in an evaluation of a particular debtor's proposed plan interest rate. Because PCA's evidence regarding its cost of funds does not conform to the market rate strategy promulgated by *Monnier Brothers*, little is added to its § 1129(b)(2) argument.

■ The Court has taken judicial notice of the interest rates on government securities as published in the Wall Street Journal at p. 57, col. 2, on February 10, 1987, the date of the confirmation hearing. On that date, the rate on treasury bonds maturing in the year 2012 was approximately 8 percent. Since the 10 percent interest rate

proposed by Debtors in their plan treatment of PCA's secured claim is not below the rate on 25–year treasury bonds adjusted for risk, it is at or above the market rate and is found to be fair and equitable.

### B. *Unsecured Claim*

■ In a cramdown situation, any impaired class that has rejected the plan is entitled to receive "property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 ..." 11 U.S.C. § 1129(a)(7)(A)(ii). PCA first objects to the treatment of its Class 10 unsecured claim on the basis that it would receive more in a chapter 7 liquidation.[3]

The Bankruptcy Code does not specifically require interest to be paid on unsecured claims. Debtors plan to treat PCA's unsecured claim by making full payment at 6 percent interest over 20 years. Arguing that this treatment complies with § 1129(a)(7)(A)(ii), they contend that "a considerable administrative tax expense" would result from liquidation. This tax liability would potentially offset any benefits PCA would share if Debtors liquidated their operation. Providing for interest at 6 percent on PCA's unsecured claim ensures that PCA will receive more under the plan. PCA counters that there is no specific evidence regarding Debtors' potential tax liability in the event of liquidation and thus no way to determine whether § 1129(a)(7)(A)(ii) has been satisfied.

PCA further objects that payment at 6 percent fails to satisfy § 1129(b)(2)(B). According to this section, "[w]ith respect to a class of unsecured claims—

> (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

---

**3.** Manta Noe is the only other member of Class 10. She does not object to the treatment of her

claim.

(ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property.

PCA argues that the *Monnier Brothers* market approach used to evaluate interest paid on secured claims applies equally to unsecured claims. Since Debtors provide for only 6 percent interest on the unsecured portion of the PCA debt compared to 10 percent on the secured portion, the unsecured treatment is not fair and equitable. Alternatively, PCA claims that its treatment does not satisfy the absolute priority rule.

The language in § 1129(b)(2)(B)(i) is very similar to that of § 1129(b)(2)(A)(i)(II). Restated, the unsecured creditor must receive "property" equal to the amount of its claim valued as of the effective date of the plan, while the secured creditor is entitled to "deferred cash payments." Debtors have offered deferred cash payments to PCA rather than other property. Accordingly, these payments must equal the present value of PCA's unsecured claim as of the effective date of the plan. *See 5 Collier on Bankruptcy* ¶ 1129.03, 1129–57 (15th Ed. 1987) This objective can be achieved by utilizing the *Monnier Brothers* market approach.

There was no direct testimony by either party aimed specifically at the 6 percent proposed rate and whether it satisfied the fair and equitable test. The only evidence before the Court is that offered regarding the appropriateness of the 10 percent rate offered on PCA's secured claim. While the testimony is equally applicable, different conclusions may be drawn from it. Arguably, for example, the risk component is higher on an unsecured claim because there is no collateral for the creditor to rely on in the event of default. This assessment is consistent with the *Monnier Brothers* "quality of security" factor. 755 F.2d at 1339. In any event, Debtors have offered to pay interest at 10 percent on their secured debt to PCA and this rate that was found to be fair and equitable based on an analysis of the analogous government security plus a risk premium.

The same rate applied to the unsecured portion of the PCA debt, in view of the sketchy liquidation analysis and heightened risk involved, and notwithstanding the somewhat shorter term, is fair and equitable within the standards of § 1129(b)(2)(B)(i). Therefore, the absolute priority issue raised by PCA need not be addressed.

### III.  *Subordination/Sale Provision*

Finally, PCA objects to the section of Debtors' plan that provides that in the event PCA's collateral is sold by Debtors, proceeds of the sale may be "used by the Debtors in the ordinary course of the Debtors' business." The plan goes on to state that Debtors will "at all times maintain property subject to liens and encumbrances securing this claim equal in kind and amounts to the unpaid balance of the allowed secured claim." Debtors have offered to amend their plan to provide that proceeds from the sale of PCA's collateral will either be paid to PCA or PCA will be given a replacement lien in other assets equal to the value of the proceeds. Upon amendment, PCA's objection will be overruled.

### IV.  *Summary*

(A) Debtors' plan of reorganization is feasible according to the standards of 11 U.S.C. § 1129(a)(11).

(B) Allowing for payment of interest at 10 percent over 25 years on PCA's secured claim and at 10 percent over 20 years on PCA's unsecured claim is fair and equitable pursuant to 11 U.S.C. § 1129(b). This memorandum shall constitute this Court's Findings of Fact and Conclusions of Law pursuant to F.R.B.P. 7052.

### ORDER

IT IS HEREBY ORDERED that Debtors have 20 days to file their § 1129(a) affidavit and Joint Plan of Reorganization as amended consistent with the foregoing Memorandum. Upon submission of the

amended plan and affidavit, an order of confirmation will enter.