In re SCHRIOCK CONSTRUCTION,
INC., Debtor.

**Bankruptcy No. 93–30366.**

United States Bankruptcy Court,
D. North Dakota.

May 20, 1994.

Ross Espeseth, Bismarck, ND, for debtor.

David Hogue, Minot, ND, for Unsecured Creditors Committee.

Richard Olson, Minot, ND, for First Western Bank.

Michael Sturdevant, Minot, ND, for Butler Machinery Co.

Robert Rau, Minot, ND, for Westlie Motor Co.

## MEMORANDUM & ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The matter before the court is a motion filed by the official unsecured creditors' committee on January 10, 1994, for an order converting the case from a Chapter 11 reorganization to a Chapter 7 liquidation pursuant to 11 U.S.C. § 1112(b) and the appointment of an interim trustee. The motion to convert was joined by First Western Bank & Trust of Minot, Butler Machinery Co., the North Dakota Workers' Compensation Bureau, Westlie Motors, and the Internal Revenue Service. The Internal Revenue Service withdrew its joinder after reaching an agreement with the debtor, Schriock Construction, Inc., shortly before the date set for hearing on this matter. The debtor generally resists the motion. A hearing was held on April 11, 1994, and lasted two days.

1.

The debtor, Schriock Construction, Inc. (Schriock), is essentially a family-owned corporation primarily engaged in crushing, hauling, and laying aggregate on highway construction projects. The structure of the company's stock ownership has enabled Schriock to become certified by the North Dakota Department of Transportation as a "Woman–Business Enterprise". This certification has been advantageous to Schriock over the years due to state and federal regulations which require general contractors to utilize a certain percentage of subcontractors on their projects who are certified as either disadvantaged or a Woman–Business Enterprise.

The competitive nature of the road construction business, coupled with an inability to accurately project expenses or foresee cost overruns and losses associated with various projects, were factors that contributed to Schriock's financial difficulties. The company's historical pre-bankruptcy performance is marred by four consecutive years of net operating losses, a diminishing working capital position, and a period which reflects that total liabilities increased at a rate in excess of 2½ times greater than the increase in total assets (2.5:1):

#### December 31, 1992:
#### Unaudited

| | |
|---|---|
| Gross Income: | $3,553,808.00 |
| Total Expenses: | $3,948,235.00 |
| Net Loss: | ($394,427.00) |
| Per Month Average Loss: | ($32,868.92) |
| Current Assets: | $ 790,744.00 |
| Current Liabilities: | $1,950,277.00 |
| Working Capital: | ($1,159,533.00) |

#### December 31, 1991:
#### Audited

| | |
|---|---|
| Gross Income: | $5,115,605.00 |
| Total Expenses: | $5,469,730.00 |
| Net Loss: | ($ 354,125.00) |
| Per Month Average Loss: | ($ 29,510.42) |
| Current Assets: | $ 932,946.00 |
| Current Liabilities: | $1,852,402.00 |
| Working Capital: | ($ 919,456.00) |

#### December 31, 1990:
#### Audited

| | |
|---|---|
| Gross Income: | $3,337,107.00 |
| Total Expenses: | $3,390,098.00 |
| Net Loss: | ($ 52,991.00) |
| Per Month Average Loss: | ($ 4,415.92) |

#### December 31, 1989:
#### Audited

| | |
|---|---|
| Gross Income: | $3,326,962.00 |
| Total Expenses: | $3,487,247.00 |
| Net Loss: | ($ 160,285.00) |
| Per Month Average Loss: | ($ 13,357.08) |

| December 31, 1990: Audited | | December 31, 1989: Audited | |
|---|---|---|---|
| Current Assets: | $403,334.00 | Current Assets: | $ 418,224.00 |
| Current Liabilities: | $1,213,699.00 | Current Liabilities: | $ 958,751.00 |
| Working Capital: | ($ 810,365.00) | Working Capital: | ($ 540,527.00) |

1989 to 1992—Total Net Loss: $961,828.00

($20,083.08 per month average loss = $961,828.00/48) [1]

| | 1989 | 1992 | | % Increase |
|---|---|---|---|---|
| Total Assets: | $1,341,474.00 | $1,879,842.00 | = | 40% |
| Total Liabilities: | $1,236,843.00 | $2,539,480.00 | = | 105% |

---

Exhibits 4 & 10. Accompanying the audited 1990 and 1991 financial statements is the accountant's opinion that "the Company has suffered recurring losses from operations and has a net capital deficiency that raise substantial doubt about its ability to continue as a going concern." In an effort to extricate itself from its financial woes and reorganize, Schriock filed for relief under Chapter 11 of the United States Bankruptcy Code on April 30, 1993.

Schriock's road to reorganization under Chapter 11 has been rocky to say the least. While operating under the protection of the automatic stay, Schriock has been forced to factor a significant portion of its accounts receivable and sell certain vehicles and equipment in order to increase its cash flow. The reports furnished by the debtor to the United States Trustee (Trustee) provide a snapshot of the company's post-petition cash inputs and outlays:

| May 1, 1993 through February 28, 1994 | |
|---|---|
| Total Receipts: | $1,366,487.58 |
| Total Disbursements: | $1,314,769.32 |
| Net Receipts: | $ 51,718.26 |

Exhibit 3. Although total receipts for the ten-month reporting period exceed total disbursements, a review of the monthly operating schedules reveal that the debtor's actual cash receipts were subsidized by cash infusions from shareholder loans in the aggregate amount of $45,317.04. The net receipts figure is thus artificially inflated by share-holder loans and does not provide a true picture of Schriock's postpetition cash flow or operational performance. If subtracted from net receipts, it becomes readily apparent that Schriock has actually attained net receipts from "operations" in the amount of $6,401.22 ($640.12 per month average).

Schriock's inability to generate sufficient post-petition operating capital to meet payroll and related expenses led to the loss of a number of long-time employees who were seemingly instrumental to the success of the company's operational efforts.[2] Additionally, Schriock has incurred postpetition indebtedness over the ten-month reporting period which, as of the hearing date, remains outstanding *and* delinquent in the approximate amounts:

Outstanding Postpetition Indebtedness
May 1, 1993 through February 28, 1994

| | |
|---|---|
| Lund Oil | $ 8,000.00 |
| IRS | $200,000.00 + |
| Workers' Compensation | $13,560.64 |
| Job Service | $25,000.00 |
| State Tax | $13,577.28 |
| Napa Parts | $4,000.00 |
| Total | $264,137.92 [3] |

A number of the aforementioned obligations are administrative expense or priority claims which will be accorded a preferential position under any distribution scheme. *See, e.g.,* Exhibits 4 & 5. Through the response to the instant motion, the Trustee indicated that the debtor was delinquent in the payment of

---

1. The last time that Schriock earned a profit was in 1987.

2. Several employees terminated their positions with Schriock due to repeated postpetition delinquencies in payroll and the receipt of payroll checks which were unpaid and returned due to nonsufficient funds (NSF).

3. The IRS obligation is merely an estimate to which the parties agreed. It is quite possible that the obligation to the IRS actually exceeds the agreed upon figure. *See* Exhibit 1. The amounts owing to workers' compensation and job service, although past due, are computed on an annual or quarterly basis and cover a period ending on April 30, 1994.

statutory fees for the third and fourth quarters of 1993 and late in filing the requisite financial reports.[4]

A "conservative" comparison of Schriock's postpetition operating position during the ten-month period following the bankruptcy filing with its prepetition position, reveals a floundering state of financial affairs:

*Postpetition:* ($25,773.67) per month average loss.[5]

*Prepetition:* ($20,083.08) per month average loss.

The debtor contends that some of the figures included in the net disbursement calculation were nonrecurring expenditures and not properly characterized as "operating expenses". According to the debtor, a number of postpetition payments made to various creditors, in the amount of $221,116.44, for adequate protection, to cure defaults and make payments on assumed leases, should be subtracted from any assessment of the company's operational profile since the leases have expired and will not be renewed.[6] Such a position has little, if any, merit. It cannot be seriously suggested that payments made on equipment leases essential to the generation of postpetition revenue should not be considered an operating expense of the enterprise. Nevertheless, even if the aforementioned figure was subtracted from postpetition disbursements as the debtor urges, the company still incurred a net operating shortfall in the approximate amount of ($36,-620.26) or a postpetition per month average loss of ($3,662.03).[7]

On February 22, 1994, Schriock filed its first modified plan of reorganization (plan). Counsel for the debtor indicated at the hearing on the instant matter that the plan as presently constituted represented the debtor's proposal for reorganization and is subject only to a minor addendum which will have no significant effect on feasibility. In view of the ballot tally, which revealed the existence of an overwhelming opposition to the plan, the debtor's counsel readily acknowledged that the unsecured creditors were impaired claimants and that achieving confirmation hinged upon complying with the cramdown provisions of the Bankruptcy Code. The confirmation hearing was rescheduled pending resolution of the instant matter.

2.

A bankruptcy court has broad discretion under 11 U.S.C. § 1112(b) to either dismiss a case or convert a case from a Chapter 11 reorganization to a Chapter 7 liquidation. *Lumber Exchange Bldg. Ltd. Partnership (In re Lumber Exchange Bldg. Ltd. Partnership)*, 968 F.2d 647, 648 (8th Cir.1992). *See Toibb v. Radloff*, 501 U.S. 157, 162, 111 S.Ct. 2197, 2201, 115 L.Ed.2d 145 (1991). Dismissal or conversion is appropriate if "cause" exists *and* it is in the "best interests of creditors and the estate." 11 U.S.C. § 1112(b). *See Windsor on the River Assocs., Ltd. (In re Windsor on the River Assocs., Ltd.)*, 7 F.3d 127, 133 (8th Cir.1993). It is therefore incumbent upon a court ruling on a § 1112(b) motion to determine, as a threshold matter, whether "cause" exists. Once that threshold requirement is established with the requisite degree of proof, § 1112(b) directs a court to ascertain under an analytically separate step whether dismissal or conversion is in the "best interests of creditors and the estate". *In re Great*

---

**4.** Max Schriock testified that as of the date of the hearing, the debtor was current on payments to the Trustee and current on filing the requisite financial reports.

**5.** $264,137.92 − $6,401.22 = $257,736.70/10 = ($25,773.67). [Outstanding Postpetition Indebtedness − Net Receipts from Operations = Net Loss from Operations/number of periods = Per Month Average Postpetition Loss].

The calculated per month average postpetition loss does not take into account the actual loss in value, or economic depreciation, of equipment used in the generation of revenue. Such a cost

in real world dollars is indeed relevant in determining whether the net estate is diminishing.

**6.** Cure of default on assumed leases: $111,-590.32; Lease payments made postpetition: $34,530.00; Adequate protection payments $94,-996.12 = $221,116.44.

**7.** $264,137.92 − $6,401.22 − 221,116.44 = ($36,620.26)/10 = 3,662.03. [Outstanding Postpetition Indebtedness − Net Receipts from Operations − Lease Payments etc. = Net Loss from Operations/number of periods = Per Month Average Postpetition Loss].

*American Pyramid Joint Venture,* 144 B.R. 780, 791 (Bankr.W.D.Tenn.1992).

Section 1112(b) sets forth specifically enumerated examples of "cause" for conversion which include the "continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation" as well as the inability to effectuate a confirmable plan of reorganization. 11 U.S.C. § 1112(b)(1) & (2). It should, however, be noted that the statutory list is not exhaustive and that a court may consider other factors and equitable considerations in order to reach an appropriate result in the individual case. H.R.Rep. No. 595, 95th Cong., 1st Sess. 405–06 (1977), *reprinted in* 1978 U.S.C.C.A.N. pp. 5787, 6361–62. *See* 11 U.S.C. § 102(3). *See also First Nat'l Bank v. Kerr (In re Kerr),* 908 F.2d 400, 404 (8th Cir.1990); *In re Wentworth,* 83 B.R. 705, 707 (Bankr.D.N.D.1988) (noting that the court may consider all of the circumstances of a debtor's situation when making an § 1112(b) determination); *In re Langseth,* 70 B.R. 274, 277 (Bankr.D.N.D.1987); *In re Asbridge,* 61 B.R. 97, 101 (Bankr.D.N.D.1986).

The movants bear the burden of proof and must adequately demonstrate the factual basis for the motion. *U.S. Trustee v. GPA Technical Consultants, Inc. (In re GPA Technical Consultants, Inc.),* 106 B.R. 139, 140 (Bankr.S.D.Ohio 1989). The motion for conversion in the instant case is predicated primarily upon the movant creditors' collective belief that "cause" for conversion exists in that there is a "continuing loss to or diminution of the estate" and an "absence of a reasonable likelihood of rehabilitation" within the meaning of § 1112(b)(1). Under § 1112(b)(1), *both* of the aforementioned elements must be satisfied.

The first aspect of § 1112(b)(1) requires a showing of a "continuing loss to or diminution of the estate". This element can be satisfied by demonstrating that the debtor incurred continuing losses or maintained a negative cash flow position after the entry of the order for relief.[8] *In re First Lewis Road Apartments, Inc.,* 11 B.R. 575, 576 (Bankr. E.D.Va.1981); 5 *Collier on Bankruptcy* ¶ 1112.03[i], at 1112–18 (15th ed. 1994) (noting that "[o]bviously, if the debtor has a negative cash flow after entry of the order for relief in the chapter 11 case, the first of two elements of section 1112(b)(1) is satisfied.").

The "central purpose of the Bankruptcy Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy a 'new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'" *Grogan v. Garner,* 498 U.S. 279, 286, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991) (quoting *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)). The protection afforded by the automatic stay furthers the laudable goals of the Bankruptcy Code by affording Chapter 11 debtors a breathing spell in order to reorganize and formulate a feasible plan for the future.

Schriock has been operating under the protection of the automatic stay for nearly a full year, relieved of the necessity of servicing the majority of its principal obligations. As set forth above, an examination of the company's postpetition operating performance clearly reveals that Schriock is maintaining a negative cash flow position. A fair assessment of the financial data arguably leads to the conclusion that the company's postpetition cash flow position has even deteriorated *below* the very prepetition level which precipitated the bankruptcy filing in the first instance. Schriock has not been capable of servicing basic operating expenses which are critical to the viability of the enterprise even while operating under the protection of the automatic stay, let alone generate sufficient cash flow to rehabilitate and ade-

---

**8.** The "continuing loss" or "diminution" standard can be satisfied even though the debtor may have had a positive postpetition cash flow if the value of estate assets are actually depreciating in an economic, rather than an accounting, sense. 5 *Collier on Bankruptcy* ¶ 1112.03[i], at 1112–18 (15th ed. 1994). Although the movants attempted to demonstrate that estate assets were depreciating in economic value, the court found the evidence on this point to be not sufficiently probative to warrant consideration.

quately fund a feasible plan of reorganization. Even though the debtor has factored a portion of its accounts receivable in order to increase cash flow, accounts with creditors who, postpetition, provided the company with fuel and parts integral to the operation remain delinquent. An inability to meet postpetition payroll obligations has led to the loss of key personal and an understandable drop in morale for those remaining employees. Furthermore, the debtor has been significantly delinquent in filing the monthly reports and making the payment of Trustee's fees, a ground which may by itself give rise to cause for conversion under § 1112(b). *See In re Great American Pyramid Joint Venture,* 144 B.R. 780, 790 (Bankr.W.D.Tenn. 1992) (citing *In re Bacon,* 52 B.R. 52, 53–54 (Bankr.N.D.Iowa 1985)). All of the aforementioned facts support the inescapable conclusion that there has been a continuing loss to the estate. The court is amply satisfied that the first element of § 1112(b)(1) has been fulfilled.

The second aspect of § 1112(b)(1) requires a showing of an "absence of a reasonable likelihood of rehabilitation". This element requires a showing that the state of the debtor's financial affairs are such that it is unable to re-establish itself on a firm or sound base. *In re First Lewis Road Apartments, Inc.,* 11 B.R. 575, 576 (Bankr.E.D.Va. 1981). *See In re Express Freight Lines, Inc.,* 119 B.R. 1006, 1018 (Bankr.E.D.Wis. 1990); 5 *Collier on Bankruptcy* ¶ 1112.03[i], at 1112–18 (15th ed. 1994). "Rehabilitation" thus means something different from the term "reorganization" as used in reference to Chapter 11. *In re Great American Pyramid Joint Venture,* 144 B.R. at 790. The concept of rehabilitation necessarily hinges upon establishing a cash flow from which current obligations can be satisfied. It is thus incumbent upon the court in the instant case to determine whether Schriock can emerge as an economically viable enterprise capable of servicing its obligations under a plan. This finding in turn requires an assessment of the feasibility of the debtor's proposal for rehabilitation, as contained in the first modified plan of reorganization together with the disclosure statement, under a cramdown scenario. Such a discussion necessarily overlaps with an evaluation of certain confirmational prerequisites under § 1129 and consideration of whether it is reasonable to believe that the debtor will be able to effectuate a confirmable plan of reorganization under any scenario. *See* 11 U.S.C. § 1112(b)(2). *See also In re Anderson,* 52 B.R. 159, 162 (Bankr.D.N.D. 1985) (noting that the failure of a debtor to satisfy the confirmational prerequisites of § 1129 can constitute "cause" within the framework of § 1112(b)).

Feasibility contemplates the probability of actual performance of plan provisions or whether the things to be done under a plan of reorganization can be done as a practical matter under the facts. *Clarkson v. Cooke Sales & Serv. Co. (In re Clarkson),* 767 F.2d 417, 420 (8th Cir.1985). Although the success of a plan need not be guaranteed, the court must be satisfied that it is probable that a plan is workable and will cash flow. *In re M & S Assocs., Ltd.,* 138 B.R. 845, 849 (Bankr.W.D.Tex.1992). "Sincerity, honesty and willingness are not sufficient to make the plan feasible and neither are visionary promises." *In re Clarkson,* 767 F.2d at 420. *See Tennessee Publishing Co. v. American Nat'l Bank,* 299 U.S. 18, 22, 57 S.Ct. 85, 87, 81 L.Ed. 13 (1936) ("However honest in its efforts the debtor may be, and however sincere its motives, the ... Court is not bound to clog its docket with visionary or impracticable schemes for resuscitation."). When construing feasibility requirements, this court gives Chapter 11 debtors the benefit of the doubt and will reasonably resolve conflicts in the evidence in favor of the debtor when the debtor's projections, using reasonable inputs in light of the current economic climate, indicate that the causes of the debtor's continuing losses can be corrected and that it is reasonably probable that the debtor will be able to make the plan payments. *See Prudential Ins. Co. v. Monnier (In re Monnier),* 755 F.2d 1336, 1341 (8th Cir.1985).

A plan for rehabilitation under Chapter 11 must be based on more than speculative data. Although projections are just that and there will always be a degree of uncertainty as to what actual results will be, feasibility must be predicated upon objective

facts using known operational inputs and expenditures. "When visionary schemes for reorganization entail significant risk to creditors without any reasonable probability that the debtor can successfully rehabilitate, liquidation is generally ·in order." 5 *Collier on Bankruptcy* ¶ 1112.03[i], at 1112–19 (15th ed. 1994). Although the debtor in the instant case has admittedly scaled down its operation to a certain degree and, out of necessity, either sold or returned a portion of equipment previously used in the operation in an effort decrease expenses, the plan and accompanying disclosure statement make absolutely no provision for depreciation, amortization, interest, income tax, or even materials.[9] *See* Exhibit B of Debtor's Amended Disclosure Statement. The debtor wholly failed to explain the absence of an accounting for such historically substantial expense items.

The parties dispute the exact amount of the payments that will be required fund the proposed plan of reorganization. The debtor does, however, concede that the requisite payments will be somewhere in the range of $275,000.00 to $300,000.00 annually. *See* Debtor's Post Hearing Brief, at 15. An examination of the debtor's own estimates reveals that the Schriock will be required to generate an average *net* positive cash flow (exclusive of operating expenses) in the range of $22,916.67 to $25,000.00 per month in order to merely fund the required payments as projected under the plan. The debtor's postpetition performance from operations reveals that it has been unable to even meet current operating expenses much less generate the unprecedented surplus necessary to fund the plan, despite testimony from the company's principal which revealed that almost exactly the same level of sales were generated during the postpetition period that is now projected under the plan. Moreover,

the debtor's projections for debt service under the plan of reorganization are clearly underestimated for at least two principal reasons.

First, the debtor apparently concedes that First Western Bank & Trust of Minot (First Western) is an oversecured creditor. As an oversecured creditor, First Western is entitled to enhance its claim by adding, among other things, reasonable attorney's fees actually incurred since the original agreements which support its claim clearly provide for them. 11 U.S.C. § 506(b). *See, e.g., In re Smith*, 125 B.R. 240, 242 (Bankr.W.D.Mo.1991) (citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989)); *Farmers Home Admin. v. Farmers State Bank (In re Dohn)*, 68 B.R. 282, 284 (Bankr.D.S.D. 1988). The debtor fails to give any consideration in its plan projections to the benefits afforded by operation of law, such as attorney's fees, to an oversecured creditor such as First Western.

Second, the unsecured creditors as a class are impaired claimants and have rejected the debtor's plan of reorganization. It is therefore evident that any prospect of achieving confirmation necessarily hinges upon complying with the cramdown provisions of the Bankruptcy Code which require the plan to be, *inter alia,* "fair and equitable" with respect to each impaired class of claims. *See* 11 U.S.C. § 1129(b). Specifically, Schriock's plan must satisfy the Code's codification of the judicially-created absolute priority rule as to the dissident class of unsecured creditors in order to be "fair and equitable". *See* 11 U.S.C. § 1129(b)(2)(B). The absolute priority rule specifically provides that any dissenting class of creditors must be

---

9. Although the expenses associated with depreciation, amortization, and materials would undoubtedly be less than in previous years of operation, these figures have been historically significant considerations in the net income or cash flow calculation and are completely unaccounted for in the debtor's projections:

| | Materials | Depreciation | Amortization | Interest |
|------|-----------|--------------|--------------|----------|
| 1992 | $311,552 | $250,081 | $181,066 | $154,973 |
| 1991 | $ 23,975 | $196,371 | $134,921 | $167,123 |
| 1990 | $235,370 | $169,267 | $ 44,735 | $125,730 |
| 1989 | $128,945 | $143,063 | $ 28,172 | $119,902 |

Additionally, a cursory review of a number of what should be relatively fixed expenses, such as

provided with the full "value" of its claim before any junior class can retain or receive any "property" under the plan on account of such claim or interest. *Id.* *See Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 202, 108 S.Ct. 963, 966, 99 L.Ed.2d 169 (1988); *In re Blankemeyer,* 861 F.2d 192, 194 (8th Cir.1988). A shareholder who retains an equity interest in the enterprise or the right to run the company under a plan of reorganization unquestionably retains "property" within the meaning of the rule. *Ahlers,* 485 U.S. at 207–08, 108 S.Ct. at 969; *Phoenix Mut. Life Ins. Co. v. Greystone III Joint Venture (In re Greystone III Joint Venture),* 995 F.2d 1274, 1282 (en banc), *cert. denied,* —— U.S. ——, 113 S.Ct. 72, 121 L.Ed.2d 37 (1992); *In re Landau Boat Co.,* 8 B.R. 436, 438 (Bankr.W.D.Mo.1981) (opining that the retention of an equity interest is tantamount to receiving property even if the interest has no value). It is therefore clear that under the "fair and equitable" requirement, which is defined by the absolute priority rule, equity holders cannot retain control or an interest in the reorganized debtor unless the rejecting unsecured creditor class receives the full value of its allowed claim on the effective date of the plan.[10] The purpose of the rule "is to stratify creditors and equity interests so that a cramdown, or nonconsensual plan, will not redistribute a dissenting creditor's property rights to those with a junior right or interest in the debtor." *In re Greystone III Joint Venture,* 995 F.2d at 1282.

 The debtor proposes to pay the unsecured creditors under the plan, whose allowed claims purportedly aggregate $885,-830.03, in annual installments over a ten-year period. The debtor does not intend, nor does it contemplate under any financial projection, to pay the unsecured creditors *interest* on

their allowed claims despite the fact that the former equity holders will be retaining their interests in the reorganized debtor. Counsel for the debtor argues that the unsecured creditors are not entitled to interest on their allowed claims and that the dictates of the absolute priority rule are complied with since the class of unsecured creditors are receiving the full amount of their claims through a stream of payments under the plan. The debtor's counsel is misguided. Section 1129(b)(2)(B)(i) requires the debtor to provide unsecured creditors with property of "a value, as of the effective date of the plan, equal to the allowed amount" of their claims. 11 U.S.C. § 1129(b)(2)(B)(i). The strictures of the absolute priority rule thus require the class of *unsecured creditors to be fully satisfied in all of its legal entitlements before any junior* class, such as equity holders, retain any property interest. This mandate necessarily requires that unsecured creditors receive either full payment as of the effective date of the plan or the "present value" of their claims through the stream of deferred payments. Simply put, the law in this area is well settled and requires that if the payments to the unsecured creditors are deferred over time, an appropriate discount rate, or rate of interest, must be afforded in order to compensate for the time value of money and pay the claimants the full value of their claims. *See Steelcase, Inc. v. Johnston (In re Johnston),* 140 B.R. 526, 529 (9th Cir.); *In re Blankemeyer,* 861 F.2d 192, 193–94 (8th Cir.1988); *In re Ropt Ltd. Partnership,* 152 B.R. 406, 412 (Bankr.D.Mass.1993); *In re Ribs Auto Sales, Inc.,* 140 B.R. 390, 392–94 (Bankr.E.D.Va.1992); *In re Henke,* 90 B.R. 451, 453–54 (Bankr.D.Mont.1988); *In re Keaton,* 88 B.R. 154, 156 (Bankr.S.D.Ohio 1988); *In re Noe,* 76 B.R. 675, 679–80 (Bankr.N.D.Iowa 1987); *In re Fursman*

---

computer supplies, do not seem to accurately track historical data.

**10.** The only *possible* exception to the rigid dictates of the absolute priority rule as outlined above is known in bankruptcy parlance as the "new value exception". The new value exception, where it is recognized, requires a capital infusion or a contribution of money, or money's worth, which is reasonably equivalent to the interest being retained. *See, e.g., Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 121–22,

60 S.Ct. 1, 10–11, 84 L.Ed. 110 (1939) (dictum); *Bonner Mall Partnership v. U.S. Bancorp Mortgage Co. (In re Bonner Mall Partnership),* 2 F.3d 899, 904–18 (9th Cir.1993), *cert. granted,* —— U.S. ——, 114 S.Ct. 681, 126 L.Ed.2d 648 (1994); *Anderson v. Farm Credit Bank (In re Anderson),* 913 F.2d 530, 532–33 (8th Cir.1990). The new value exception is inapplicable in this case since there will be no infusion or contribution of new capital under the plan from any source.

*Ranch,* 38 B.R. 907, 913 (Bankr.W.D.Mo. 1984). *See also* Kenneth N. Klee, *All You Ever Wanted to Know About Cram Down Under the New Bankruptcy Code,* 53 Am. Bankr.L.J. 133, 143 & 155 n. 140 (1979) ("The provision that value is measured as of the effective date of the plan requires all payments to be discounted to that date using a present-value analysis.").

■ Counsel for the debtor urges that the issue of the absolute priority rule "is a legal issue to be decided at confirmation and is not a critical issue in determining the Motion to Convert." Debtor's Post Hearing Brief, at 19. Although indeed a confirmation issue, the debtor's ability to comport to the requirements of the absolute priority rule is highly relevant in this case since it sheds a powerful ray of light on the debtor's ability to rehabilitate and its prospects for effectuating a confirmable plan. If an appropriate interest rate were factored into the annual stream of plan payments in order to provide the unsecured creditors with the full value of their claims, the clear futility of the situation and any prospect for rehabilitation becomes that much more apparent.

Furthermore, the record suggests that very little, if anything, in a positive nature has changed in the debtor's financial circumstances or operation which would raise the likelihood of rehabilitating or ever obtaining a confirmable plan of reorganization. Even the testimony presented regarding obtaining various accounts in the near future seemed unduly speculative.

■ The Bankruptcy Code does not ensure a successful reorganization, nor does it afford a framework within which a debtor can indefinitely operate. *See generally, In re Great American Pyramid Joint Venture,* 144 B.R. 780, 791 (Bankr.W.D.Tenn.1992). Rather, it merely provides a debtor with a breathing period during which a debtor may attempt to reorganize. *Id.* The time has arrived when the principals of Schriock must come to grips with the stark financial realities of their present situation. The debtor's operation simply cannot even cash flow basic operating expenditures much less fund a workable plan of reorganization which takes into account realistic inputs and outlays.

The court can envision no scenario under which a reasonable likelihood of rehabilitation can exist.

■ The court finds that an examination of the totality of the circumstances in this case clearly reveals that "cause" for conversion exists under § 1112(b). The court further finds that a conversion from Chapter 11 to the liquidating provisions of Chapter 7 would indeed be in "the best interest of creditors and the estate". Any further delay would further prejudice unsecured creditors who have already seen a significant erosion in the value of their position.

Accordingly, and for reasons stated, the motion filed by the official unsecured creditors' committee for conversion of this Chapter 11 case to a case under Chapter 7 is **GRANTED.** The case is converted to Chapter 7.

**SO ORDERED.**