In re CORNWALL PERSONAL
INSURANCE AGENCY,
INC., Debtor.

No. 02–50463–RLJ–11.

United States Bankruptcy Court,
N.D. Texas,
Lubbock Division.

July 25, 2003.

---

Myrtle Davis McDonald, G. Douglas Welch, James L. Wharton, Jones, Flygare, Brown & Wharton, Lubbock, TX, Harold H. Pigg, Clifford, Field, Krier, Manning, et al., Lubbock, TX, for Creditor.

Max Ralph Tarbox, Law Offices of Max R. Tarbox, Lubbock, for Debtor.

### MEMORANDUM OPINION

ROBERT L. JONES, Bankruptcy Judge.

The court considers for confirmation Cornwall Personal Insurance Agency Inc.'s ("Cornwall's") modified Chapter 11 plan. By order entered March 14, 2003, the court denied confirmation of Cornwall's Combined First Amended Plan of Reorganization ("Plan") because of Cornwall's failure to establish that the Plan's treatment of the claim of David Brenholtz ("Brenholtz"), Cornwall's major creditor, satisfied the "fair and equitable" standard of section 1129(b) of the Code. Specifically, Cornwall failed to prove that the Plan's proposed stream of payments and 6% interest rate provided Brenholtz with the present value of his claim. *See* Memorandum Opinion of February 28, 2003. The court found that the Plan otherwise satisfied all confirmation requirements.[1] *See id.* The court afforded Cornwall the opportunity to modify the Plan to address the Plan's single deficiency. The sole issue, then, is whether Cornwall has met the burden of establishing that the Plan as

---

1. The court's order, entered March 14, 2003, and the court's memorandum opinion, entered February 28, 2003, are hereby incorporated for all purposes.

modified provides Brenholtz, the Class 6 claimant, with the present value of his claim. Brenholtz objects to confirmation of the Plan as modified. Hearing was held May 27, 2003.

The court has jurisdiction of this proceeding pursuant to 28 U.S.C. § 1334 and 11 U.S.C. § 1129. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L).

## Facts

Cornwall filed this Chapter 11 case on April 12, 2002. The event that forced Cornwall to seek bankruptcy protection was a state court judgment obtained by Brenholtz in the 364th District Court of Lubbock County, against Cornwall, Ronald Hettler, who is Cornwall's sole shareholder, and Robin Hettler, Ron Hettler's wife. Brenholtz holds an unsecured claim as a result of such judgment in the amount of $495,000, encompassing actual and punitive damages for numerous contract and tort claims. Cornwall has appealed the judgment, and the parties have agreed that the final amount of Brenholtz's claim will be fixed by the outcome of the appellate process. The Plan as modified proposes payment of Brenholtz's claim, regardless of what transpires on appeal.

With respect to the present value issue, the Plan, as modified, provides the following regarding the Class 6 claim of Brenholtz:

> Interest to be applied is calculated as follows: the U.S. Treasury's 10 year bond rate as to the date of confirmation plus a risk component of 2.0%, but in no event would the interest rate be less that 6.0%.

Cornwall's Modification to Plan (April 2, 2003). The applicable interest rate is calculated by taking a "snap shot" of the bond rate on the date of confirmation, and then adding 2.0%. If this results in a rate of less than 6%, then 6% is the rate. This fixes the applicable interest rate for the life of the plan, which will not subsequently be affected by fluctuations in the bond rate. It is undisputed that the current bond rate plus 2% is less than 6%. Six percent is therefore the applicable rate. Cornwall estimates that Brenholtz's claim will be paid in approximately 12½ years. The Plan as modified retains deferred payments, which escalate over time to a maximum amount of $6,000 per month.

## Parties' Contentions

Both Cornwall and Brenholtz offered expert opinion testimony regarding the appropriate rate of interest to pay on Brenholtz's claim. Cornwall's expert, a senior vice president at First United Bank and the officer responsible for Cornwall's accounts, testified that Cornwall is a good customer and a good credit risk. Cornwall's expert further testified that cash flow and security are the most important factors in determining the appropriate rate of interest to charge Cornwall. With respect to Cornwall's loan with the bank, Cornwall's expert testified that the bank charges Cornwall a floating rate which is derived from the Wall Street Journal prime rate of 4.25%, plus a risk factor of .5%, with a floor of 6%. On cross examination, Cornwall's expert admitted that such note is secured by Cornwall's accounts receivable, which well exceed the bank's loan to Cornwall. However, Cornwall's expert also testified that his bank would make an unsecured loan to Cornwall, at an interest rate equal to the prime rate plus a risk factor of 1.5%, with a floor of 6%.

Brenholtz's expert, an economics professor with a doctoral degree, testified that the appropriate rate of interest Cornwall should pay to insure that Brenholtz receives the present value of his claim is upwards of 9%. Brenholtz's expert premised his conclusion by posing the question

to the effect of "what rate does Brenholtz forgo by not receiving full payment on his claim as of confirmation?" Thus, the appropriate interest rate must reflect Brenholtz's opportunity cost. The interest rate should, according to Brenholtz's expert, reflect Brenholtz's return on $495,000 invested over a given period of time. Brenholtz's expert stated the average annual return on funds invested in the stock market over a sufficient period of time to factor in market fluctuations is approximately nine to ten percent. When asked why Brenholtz should invest such a hypothetical investment in the stock market, as opposed to a safer mechanism such as government bonds, Brenholtz's expert testified quite simply that he invests his retirement in the stock market.

The parties and the experts have a philosophical disagreement over the meaning of the term present value: is present value determined by examining the cost to the debtor of obtaining a similar loan, or is present value determined by examining the cost to the creditor for forgoing use of the funds?

### *Law*

■■■ Cornwall's Plan as modified relies on the cram down provisions of section 1129(b) for confirmation. 11 U.S.C. § 1129(b) (2003). Among its requirements, section 1129(b) mandates that a plan be "fair and equitable" with respect to each class that is impaired under the plan, and that has not accepted the plan.[2] *Id.* § 1129(b)(1). Brenholtz is impaired under, and has not accepted, the Plan. In order to be "fair and equitable" with respect to a class of unsecured claims, the plan must "provide[ ] that each holder of a claim of such class receive or retain on account of

such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim."[3] *Id.* § 1129(b)(2)(B)(i). This requirement is frequently referred to as the present value requirement. Cornwall, as the proponent of the Plan, bears the burden of proving that the Plan satisfies all requirements for confirmation, including present value. *See Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters. Ltd. (In the Matter of Briscoe Enters. Ltd.),* 994 F.2d 1160, 1163–64 (5th Cir.1993). Cornwall may meet this burden by a preponderance of the evidence. *See id.* at 1165. The question of present value, including the appropriate interest rate, is a question of fact. *See id.* at 1169.

A debtor may pay an unsecured creditor with deferred payments over the life of the plan until such creditor's claim is paid in full. *See, e.g., In re Schriock Constr. Inc.,* 167 B.R. 569, 578–79 (Bankr.D.N.D.1994). It is not enough, however, that the debtor merely pay the principal amount of such claim over time: a sum received today is worth more than such sum received over time. *See id.* Thus, the present value requirement necessitates the payment of interest when the debtor proposes to pay a claim over a period of time. *See In the Matter of Briscoe Enters. Ltd.,* 994 F.2d at 1169 ("Deferred cash payments consist of an appropriate interest rate and an amortization of the principal which constitutes the [ ] claim"). It is this rate of interest that is directly at issue in the present case.

■■■ In *Briscoe,* the Fifth Circuit considered the issue of present value with respect to cram down of secured claims. *Id.* While *Briscoe* did not explicitly adopt a particular formula for determining the ap-

---

2.  The court has previously ruled that all other requirements of section 1129(b) have been met.

3.  Cornwall does not seek confirmation under section 1129(b)(2)(B)(ii).

propriate interest rate, *Briscoe* held that the appropriate interest rate must compensate "for the specific risk level." *Id.* In determining such interest rate, the circuit stated that the United States Treasury rate for a bond with a maturity period similar to the payout period under the plan is helpful because it includes all factors except the risk premium. *See id.* The treasury rate is the riskless rate. *See id.* To this rate, then, is added the appropriate risk premium, which takes into account the specific facts of the debtor's case, particularly the debtor's ability to repay. *See id.* The risk premium is necessarily fact dependant and may vary widely from debtor to debtor. *See id.* The formula employed by *Briscoe*, therefore, is that the interest rate for purposes of present value should include the risk-free rate, to which is added a risk component. *See id.*

While *Briscoe* is instructive on the manner of calculating the appropriate interest rate, the Fifth Circuit's recent *Lambert* opinion addresses the meaning and nature of the present value requirement. *Mississippi State Tax Comm'n v. Lambert (In the Matter of Lambert)*, 194 F.3d 679 (5th Cir.1999). *Lambert* considered the issue of whether the Chapter 11 debtor's plan proposed to pay the taxing authority the present value of such taxing authority's claim as mandated by section 1129(a)(9)(C). *Id.* at 680. Specifically, the issue was whether the State of Mississippi's statutory 12% annual interest rate for taxes set the present value interest rate at 12%, or whether the market rate determined the appropriate interest rate to insure present value. *See id.*

■ After a review of case law, legislative history, and bankruptcy policy, the circuit concluded that the market rate is the appropriate rate of interest to insure present value for purposes of section 1129(a)(9)(C). *See id.* at 684. Analogizing the situation to a coerced loan from the creditor to the debtor, for which the creditor receives compensation at the prevailing market rate, *see id.* at 681, *Lambert* held that the appropriate rate of interest "is the current market rate equivalent to the rate the debtor would have to pay to borrow the same amount in the commercial loan market." *Id.* at 684. The appropriate market rate—the rate the debtor would have to pay to obtain a loan on equivalent terms—therefore must take into account "the length of the payout period, the quality of the security, and the risk of subsequent default." *Id.* at 682. "Because the claim is unsecured, a case-by-case determination of the rate of interest the reorganizing debtor would have to pay to obtain a loan on equivalent terms in the open-market ensures that the creditor is compensated at an appropriate rate." *Id.* at 683.

■ Thus, in a nutshell, *Lambert* held that the present value determination required by section 1129(a)(9)(C) requires a rate of interest that the debtor would have to pay were he to borrow the amount of money equal to the allowed amount of the claim in the open market, on terms identical to those proposed by the plan, and factoring in the risk involved. *Id.* at 684. Implicitly, therefore, *Lambert* rejected the argument that present value is determined by the subjective time-value of funds to the creditor. Otherwise *Lambert* would have approved the 12% interest rate that the taxing authority was entitled to receive absent the bankruptcy filing. *See id.* at 680.

*Lambert* considered the issue of present value in the context of tax claims under section 1129(a)(9)(C) and *Briscoe* considered the issue in the context of section 1129(b)(2)(A)(i)(II). The issue presently before the court concerns present value for purposes of cram down of an unsecured class under section 1129(b)(2)(B)(i). Nev-

ertheless, *Lambert* and *Briscoe* apply with full force to the present issue. Section 1129(a)(9)(C) provides that, with respect to a tax claim, "the holder of such claim will receive on account of such claim deferred cash payments, over a period not exceeding six years ... of a value, as of the effective date of the plan, equal to the allowed amount of such claim." 11 U.S.C. § 1129(a)(9)(C) (2003). Similarly, section 1129(b)(2)(A)(i)(II) provides that, with respect to a class of secured claims, "each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property." *Id.* § 1129(b)(2)(A)(i)(II). Section 1129(b)(2)(B)(i)—at issue in the case at bar—provides that, with respect to a class of unsecured claims, "the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim." *Id.* § 1129(b)(2)(B)(i).

Thus, *Lambert* and *Briscoe* considered and applied the identical phrase as employed in section 1129(b)(2)(B)(i): "value, as of the effective date of the plan." Since *Lambert* and *Briscoe* considered identical language to that employed in section 1129(b)(2)(B)(i), and since identical "language used in one portion of a statute [ ] should be deemed to have the same meaning as the same language used elsewhere in the statute," *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 260, 113 S.Ct. 2063, 2070, 124 L.Ed.2d 161 (1993), *Lambert's* and *Briscoe's* holdings concerning present value apply with equal force to section 1129(b)(2)(B)(i). *See, e.g., In re New Midland Plaza Assocs.*, 247 B.R. 877, 889 (Bankr.S.D.Fla.2000) (concluding that Eleventh Circuit's market approach, as

employed by such circuit in the context of section 1129(a)(9)(C), applies with full force to section 1129(b)(2)(B)(i)).

Indeed, applying *Lambert* and *Briscoe* to section 1129(b)(2)(B)(i) is in line with the vast majority of cases that have considered the issue of present value in such subsection: such majority holds that the present value requirement mandates the use of a market rate, consisting of the risk-free rate plus un upward adjustment to factor in the appropriate risk, to arrive at the rate that the debtor would have to pay were he to obtain a loan on the open market identical to the plan's treatment of the crammed-down class. *See, e.g., In re Byrd Foods Inc.*, 253 B.R. 196, 203–04 (Bankr.E.D.Va.2000); *In re New Midland Plaza Assocs.*, 247 B.R. at 889 ("Under the 'coerced loan' approach, the court must look to interest rates charged by the creditor making a loan to a third party with similar terms, duration, collateral, and risk"); *In re Henke*, 90 B.R. 451, 454 (Bankr.D.Mont.1988) ("the proper rate of interest is the prevailing market rate of interest which the debtor would pay a commercial lender for a loan of equivalent amount and duration, considering the risk of default and any security").

#### Application

■ With *Briscoe* and *Lambert* controlling the issues, therefore, the court must determine the interest rate that Cornwall would have to pay were it to borrow a sum of money equal to Brenholtz's claim on the open market, with terms identical to the Plan's treatment of Brenholtz's claim. *In the Matter of Lambert*, 194 F.3d at 684. To arrive at such rate, the court should add the appropriate risk premium as determined by the market, factoring in the length of the payout period, the quality of the security, and the risk of subsequent default, to the current risk-free rate for

similar loans. *See id.* at 682; *In the Matter of Briscoe Enters. Ltd.*, 994 F.2d at 1169.

Cornwall's expert testified that the risk-free interest rate is the prime rate, currently at 4.25%. Cornwall's expert then testified that, given Cornwall's specific situation, the appropriate risk premium for an unsecured loan with identical terms to the terms proposed by the Plan is 1.5%. Cornwall's business is strong and its future is bright. It appears that a relatively low risk premium is justified. Thus, Cornwall's expert testified that Cornwall would pay 6% (5.75% with a floor of 6%) interest were Cornwall to obtain a loan on the open market with terms identical to the Plan's treatment of Brenholtz's claim.

Brenholtz's expert did not testify that 9% is the market rate that Cornwall would have to pay. Rather, Brenholtz's expert testified that 9% is the return that Brenholtz may be able to obtain were he to receive the funds immediately and invest them as he saw fit. Brenholtz's expert applied the incorrect legal standard for present value. The court cannot accept the conclusions of Brenholtz's expert. *See, e.g., English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir.1993) (remanding case because of judge's acceptance of expert testimony that was predicated upon incorrect legal standard); *Gaschler v. Scott County, Kan.*, 963 F.Supp. 971, 981 (D.Kan.1997).

No evidence was offered to rebut Cornwall's expert. Brenholtz's expert did not testify that the current risk-free rate is anything other than 4.25%. Brenholtz's expert did not testify that Cornwall's circumstance requires a risk premium in excess of 1.5%, or that the market rate for a loan to Cornwall identical to the "coerced" loan from Brenholtz would exceed 6%. That Brenholtz would not make such a loan for 6% interest is irrelevant. *See In the Matter of Lambert*, 194 F.3d at 684.

Accordingly, the court concludes that Cornwall has met its burden of establishing that a 6% interest rate will, under the facts and circumstances of this case, pay Brenholtz the present value of his claim. *See, generally, Robertson v. Superior PMI Inc.*, 791 F.2d 402, 411 (5th Cir.1986) (noting that court's decision based on unrebutted expert evidence is "unassailable"). Cornwall's treatment of Brenholtz's claim under the Plan, as modified, is fair and equitable in accordance with section 1129(b)(2)(B)(i).

### Conclusion

For the foregoing reasons, as well as those set forth in the court's Memorandum Opinion entered February 28, 2003, the court approves confirmation of Cornwall's Plan as modified.